THE COUNTY COMMISSIONERS OF PIKE COUNTY, plaintiffs in error, *vs.* THE PEOPLE OF THE STATE OF ILLINOIS, on the relation of BENJAMIN B. METZ, defendants in error.

*Error to Pike.*

The question, as to who shall be the relator in an application for a mandamus, depends on the object to be attained by the writ. Where the remedy is resorted to for the purpose of enforcing a private right, the person interested in having the right enforced must be the relator.

The relator is considered as the real party, and his right to the relief demanded must clearly appear. A stranger is not permitted officiously to interfere and sue out a mandamus in a matter of private concern.

Where the object is the enforcement of a public right, the People are regarded as the real party, and the relator need not show that he has any legal interest in the result. It is enough that he is interested as a citizen, in having the laws executed, and the right in question enforced.

By the express provisions of the statute, the successful party in the proceeding for a mandamus, recovers costs in all cases.

The act of February 28th, 1845, authorizing counties to apply such portions of the internal improvement fund received by the counties, under the act of February 27th, 1837, and which had been loaned by them, to " any and all purposes they may think proper," does not extend to the county of Pike; a specific appropriation having been made by the Legislature of that fund, by the act of February 9th, 1839.

Where a specific fund given to a county by the Legislature, to be held in trust for certain purposes, is diverted from that purpose and mixed with the general funds of the county, it is not error in the Court to award a mandamus, to compel such fund to be paid over to to the person entitled to it, and to direct an order to be drawn upon the general funds of the county in the treasury.

This was a proceeding by mandamus in the Pike county Circuit Court, instituted by the relator against the county commissioners of that county, to compel the payment to him of the sum of one hundred and twenty-five dollars, and interest, which had been originally appropriated by the Legislature to the county, and by a subsequent law set apart for the improvement of the navigation of McKee's creek, in said county, to be expended by the relator.

By the fifteenth division of the eighteenth section of the act to establish and maintain a system of internal improvements, in force 27th February, 1837, it was enacted, that "there shall be appropriated the sum of two hundred thousand dollars, of the first moneys that shall be obtained under the provisions of this act, to be drawn by the said counties, in a rateable proportion to the census last made, through which no railroad or canal is provided to be made at the expense or cost of the state of Illinois; which said money shall be expended in the improvement of roads, constructing of bridges, and other public works." Under this provision, Pike county received about twenty thousand dollars, which, by an act of the Legislature to provide for certain improvements in that county, in force February 9, 1839, was specifically appropriated to certain roads, bridges, &c., by name; stating the amount to be expended on each, dividing the county into districts, and naming a commissioner for each district, to superintend the works within the same. This act appropriated "five hundred dollars to the improvement of the navigation of McKee's creek, as far up as Chambersburg, and that B. B. Metz be commissioner to superintend said work." Each of the commissioners, before entering upon the duties assigned them, was to enter into bond, with sureties, in such sum as the County Court should direct, conditioned for the honest and faithful discharge of his duties, &c., and for the proper application of all moneys which should come to his hands, under the provisions of this act: the bond to be approved and filed with the clerk of the County Court. The money was to remain in bank, to the credit of Pike county, to be drawn upon the order of the county com-

missioners. The county commissioners were to draw one-fourth part of the money appropriated, and apportion the amount among the said commissioners of each district, and when he should have expended that amount, and certified under oath to its faithful application, the county commissioners were to continue to draw the residue, in fourth parts, until the whole should be expended. Vacancies occurring in the commissioners for the districts, were to be filled by the County Court, and the commissioners were to receive two dollars and fifty cents as a compensation for each day they should be actually employed.

On the twenty-eighth day of February, 1845, the Legislature passed the following act:

" Section 1. That the acts of the County Commissioners' Courts of the several counties of this state, in loaning at interest that portion of the internal improvement fund, which fell due said counties under the act of February twenty-seventh, one thousand eight hundred and thirty-seven, establishing a general system of internal improvements, be, and the same is hereby, legalized.

" Sec. 2. That said County Commissioners' Courts are also empowered to collect the money so loaned, as is provided for by law for the collection of other indebtedness.

" Sec. 3. That it shall be the duty of said County Commissioners' Courts, and they are hereby required, to cause to be renewed, all bonds given as evidence of indebtedness to said fund, with good and sufficient security.

" Sec. 4. That upon the debtor's compliance with the third section of this act, no higher interest shall be collected from said debtor, from and after the renewal of any such bond, than six per cent. per annum; *Provided,* that this provision shall not extend to any portion of said funds which have, by law, been constituted a portion of the common school fund of any county in this state.

" Sec. 5. That the county commissioners of the several counties of this state, may apply all such money, when collected, to any and all purposes they may think proper. This act to be in force from and after its passage."

In his application for the mandamus, the relator sets forth his appointment under, and compliance with the requisitions of the

second of the foregoing laws; and that the county commission-
ers of said Pike county have, from time to time, paid over to him
three instalments of the five hundred dollars, appropriated to
the improvement of said creek, for which he has faithfully ac-
counted; and that he is informed and believes that the county
commissioners, shortly after the passage of the said law of 1839,
drew the amount appropriated to McKee's creek from the bank,
and that the unexpended fourth instalment has been loaned by
them, with his assent, for the last four or five years, at interest.
That the expenditure of the residue of the appropriation is ne-
cessary, &c.; that he has frequently applied to the County Court
for it, and that it has been refused him; the Court alleging as a
reason for the refusal, that the foregoing act of 1845, had given
them discretionary power over the fund, and that they should
appropriate it to other objects.  Upon this statement, an alterna-
tive mandamus was awarded.  To this writ, after service upon
them, the county commissioners answered, admitting the appro-
priation, and the specific direction of its use, as set forth in the
law of 1839, but insist that this was subject to subsequent and
other dispositions of the fund by the Legislature, and to be di-
verted from the special objects stated in the law of 1839, in like
manner as the fund due to other counties.  They set up the act of
1845, as placing the fund at their disposal; and claim, that, by
the fifth section of that act, unless with their consent, the fund
was no longer subject to the special objects of improvement
enumerated in the law of 1839.  That they do not think proper
to make any further appropriation of the fund to the improve-
ment of McKee's creek, and design to appropriate it otherwise,
to more useful improvements, and prayed the opinion of the
Court, believing that the fund sought by the relator to be obtain-
ed from them, is the same money placed by the provisions of the
law of 1845 under their control, and that the relator, not hav-
ing any claim thereto, that they, the respondents, should be dis-
charged.  Upon this answer the rule was made absolute, and,
on motion of the relator, a peremptory mandamus was awarded,
commanding the payment of the said sum of one hundred and
twenty-five dollars, with the interest accumulated thereon, by
an order on the county treasurer, since the money originally
came under the control of the commissioners, and all costs.
These proceedings were heard before Purple, Judge.

The respondents sue out this writ of error, and seek a reversal of the order and judgment, upon the peremptory mandamus, and assign for error, the awarding of the peremptory mandamus, and the judgment for costs.

R. S. Blackwell, for plaintiffs in error:

1. Metz has no legal interest in the fund he seeks to reach in this case by mandamus, and cannot therefore be permitted to prosecute this suit. Putnam vs. Valentine, 5 Ohio R., 117; Sanger vs. Co. Com'rs of Kennebec, 25 Maine R., 291; Smith vs. Heuston, 6 and 7. Ohio Cond. R., 52; Harper vs. Ragan, 2 Blackf. R., 39. 2. If he has such interest in the fund, assumpsit for money had and received will lie. The rule is, that a mandamus will not lie where there is any other specific legal remedy. People vs. Bradwell, 2 Cow. R., 444; 1 Wend. R., 318; 10 John. R., 484. 3. The return shows that the money is loaned out. It is, therefore, not subject to the order of the relator. If the county commissioners are required to draw an order on the particular fund, it would be unavailing. A general order to pay out of any funds in the treasury, cannot be required or given under the law. State vs. Township 4, 1 and 4 Ohio R., 268; Universalist Church vs. Columbia Township, 6 and 7 Ohio R., 192. 4. The appropriation of the fund in controversy, was a mere gratuity by the state, which did not become perfect until an actual delivery of the money to the commissioner appointed to expend it. 2 Kent Com., 438. Therefore, no action can lie for the money thus appropriated, though withheld by the county. Pearson vs. Pearson, 7 John. R., 26; Fink vs. Cox, 18 John. R., 145. Again, the Legislature revoked the gift before delivery, which every donor has the right to do. R. S., 605, sec. 5; 2 Kent, 439. 5. The County Court have a discretion as to the application of the fund, and the rule is, that where an inferior tribunal has a discretion, it cannot be coerced by mandamus.

M. Hay, for the relator and defendant in error:

1. That the relator, Metz, was not the party plaintiff in this proceeding. The People are the real party, both nominally and really, in theory and in fact. The object of this proceeding is to enforce a public statute, upon the suggestion that the officers

appointed to carry it out had refused to do their duty. In such a case, the wrongful refusal of the officers to act, is no more the concern of one citizen than another. All are alike interested, and any person may become relator. The People cannot act except through individual information; either by the Attorney General, or some private person. In matters of public right, founded on a public statute, it is unnecessary for the relator to to show any interest in the matter distinct from that of other citizens. As the relator in this case was more conversant with the facts than any other person, it was peculiarly proper that he should become relator. People *vs.* Collins, 19 Wend., 64. 2. The People have no other adequate remedy in this case. Neither an action of assumpsit nor an appeal could be prosecuted. 3. The return to the alternative mandamus, shows the money to be in the county treasury: if so, the order is in the proper form; no other could be made. The original fund had been converted into money, and was in the county treasury. 4. The duty to be performed by the county commissioners in this case, was entirely ministerial, involving no discretion whatever. Sections 8 and 9 of the act of 1838–9, appropriating the fund. 5. If there was any discretion to be exercised, having refused to exercise that discretion, mandamus was the proper remedy. Officers appointed to the performance of a duty, involving the exercise of a discretion, will be compelled to exercise that discretion, although the Court will not direct *how* they are to use it. 5 Halsted, 57; 3 Binn., 273. 6. The proper construction of the acts of the Legislature of 1836–7, establishing a general system of internal improvements, the act of 1838–9, appropriating the fund in Pike county, and the act of 1845, "in relation to certain counties therein named," shows the relator to be entitled to this money as commissioner under the law of 1838–9; in other words, that the act specifically appropriating the money in Pike county, was not repealed by the act of 1845, "in relation to certain counties."

Opinion by TREAT, C. J.:

It is contended that the relator has not such an interest in the fund sought to be recovered, as will authorize him to prosecute this peculiar remedy. The question, who shall be the relator, in an application for a mandamus, depends upon the object to be

attained by the writ. Where the remedy is resorted to for the purpose of enforcing a private right, the person interested in having the right enforced, must become the relator. He is considered as the real party, and his right to the relief demanded must clearly appear. A stranger is not permitted officiously to interfere, and sue out a mandamus in a matter of private concern. But where the object is the enforcement of a public right, the People are regarded as the real party, and the relator need not show that he has any legal interest in the result. It is enough that he is interested, as a citizen, in having the laws executed, and the right in question enforced. See the case of The People vs. Collins, 19 Wendell, 56, where this question is much discussed, and the foregoing conclusions are clearly stated. No doubt is entertained of the right of Metz to become the relator, and pursue this remedy. The object of the suit is not a matter of individual interest, but of public concern. Any citizen of the county, especially of the locality interested in having the improvement prosecuted, could become the relator, and obtain the mandamus. There is a manifest propriety in permitting Metz to give the information, and conduct the proceeding. He has the direction of the improvement, and the money, when received, is to pass into his hands, and be disbursed by him.

It is insisted that the act of the 28th of February, 1845, repealed the act of the 9th of February, 1839, and vested the county commissioners with full discretion over the fund in controversy; and this presents the main question in the case. The act of the 27th of February, 1837, gave the fund to the county, to be expended in the construction of such public works, within its limits, as the county commissioners, in their discretion, might direct. Before this discretion was exercised, and before the money was received from the state, the Legislature, by the act of the 9th of February, 1839, withdrew the fund from the discretion and control of the county commissioners, and required it to be expended in the construction of certain designated improvements, and under the direction of certain persons named in the act. The money was required to remain in the bank, to the credit of the county, but was only to be drawn out by the county commissioners, from time to time, as it should be needed for the prosecution of the improvements, and paid over to the persons having the superintendence thereof. The fund was appropria-

ted to certain specified purposes, over which the county commissioners were to have no other control than to receive the money, and pay it out in the manner prescribed by the act; and in doing that, they were to act merely as the trustees of the state, and of those beneficially interested in the proper expenditure of the money. The improvements were to be constructed under the authority of the state, and not in pursuance of any directions of the county commissioners. From the passage of the act, the fund ceased to be the property of the county, and subject to the control of the county commissioners. It was recalled by the state, and another and different disposition made of it. It became another fund, devoted to specific objects, and to be expended under different authority, and by different agents. In the opinion of the Court, the act of 1845 was not intended to repeal, or in any manner affect the act of 1839; but was only designed to apply to counties that had actually received their portion of the fund falling due them, under the provisions of the internal improvement act; and which, instead of expending it as directed by that act, had loaned it out on interest; or, in other words, the act only embraced cases where the fund still belonged to the county, and was subject to its disposition and control. The act legalized the acts of the county commissioners, in such cases, in loaning the money, instead of applying it as originally designed; and empowered them to call it in, under certain restrictions, and then to make such application of it as they, in their judgment, might deem best for the interests of the county. It was confined in its operation to moneys that had gone into the possession of a county, in pursuance of the internal improvement law; and did not extend to moneys that might pass into the hands of the county commissioners, as mere trustees, for the purpose of being paid over to the agents of the state. This was the entire scope and design of the act. Its object was two-fold; first, to legalize the loaning of the fund which a county had obtained from the state; and, second, to vest the county commissioners with a larger discretion over it when collected. In the case of Pike county, there was nothing on which the act could operate. It never, in point of fact, received the fund that fell due it by the act of 1837. Before the money was obtained, the power to receive it was recalled, and the fund was diverted by the state. There was no such fund belonging to the county; no

portion of which could have been loaned. There were no loans to be legalized; no further discretion to be conferred on the county commissioners. The proviso in the fourth section of the act of 1845, was probably designed to apply to the fund which the county of Bond received under the internal improvement law. By a special act, passed on the 12th of February, 1839, that county was expressly authorized to loan the fund, and expend the income on the objects for which the appropriation was made. By an act of the 21st of February, 1843, this fund was added to the school fund of the county, and the county commissioners were required to pay over to the school commissioner, the amount of the same in money, or "good solvent notes, well secured." In complying with these directions, it is highly probable, that many of the notes given for indebtedness to the fund, were transferred to the school commissioner, and were, in fact, unpaid on the passage of the act of 1845. Under the general language of the act, the debtors might demand a renewal of these securities, at the reduced rate of interest; and the proviso was inserted to avoid such consequences.

The Circuit Court properly required the county commissioners to draw a general warrant on the treasurer, for the payment of the sum in dispute. The money drawn from the bank had been mingled with the funds of the county, and could not be restored in kind. The course adopted was the only way in which payment could be enforced.

The relator was entitled to his costs. The judgment for costs is not against the county, but against the commissioners personally. By the express provisions of the statute, the successful party in the proceeding for a mandamus recovers costs in all cases.

The judgment of the Circuit Court must be affirmed, with costs.

*Judgment affirmed.*