## Union Pacific Railroad Company *v.* Hall et al.

1. The initial point of the Iowa branch of the Union Pacific Railroad was fixed by the act of Congress of July 1, 1862 (12 Stat. 489), on the Iowa bank of the Missouri River.
2. The order of the President of the United States, bearing date the seventh day of March, 1864, established and designated in strict conformity to law the eastern terminus of said branch at a point "on the western boundary of Iowa east of and opposite to the east line of section 10, in township 15, north of range 13, east of the 6th principal meridian, in the Territory of Nebraska."
3. The bridge constructed by the Union Pacific Railroad Company over the Missouri River, between Omaha in Nebraska and Council Bluffs in Iowa, is a part of the railroad. The company was authorized to build it only for the uses of the road, and is bound to operate and run the whole road, including the bridge, as one connected and continuous line.
4. Private persons may, without the intervention of the government law-officer, move for a *mandamus* to enforce a public duty not due to the government as such.

Error to the Circuit Court of the United States for the District of Iowa.

Submitted on brief by *Mr. A. J. Poppleton* for the plaintiff in error, and by *Mr. John N. Rogers, contra.*

Mr. Justice Strong delivered the opinion of the court.

This is a proceeding instituted under the act of Congress of March 3, 1873 (17 Stat. 509, sect. 4), which confers upon the proper Circuit Court of the United States jurisdiction to hear and determine all cases of *mandamus* to compel the Union Pacific Railroad Company to operate its road as required by law. The alternative writ, as amended, commanded the railroad company to operate the whole of their road from Council Bluffs westward (including that portion thereof between Council Bluffs and Omaha, and constructed over and across their bridge spanning the Missouri River) as one continuous line for all purposes of communication, travel, and transportation; and especially commanded them to start from Council Bluffs their regular through freight and passsenger trains westward bound, and to run their eastern-bound trains of both descriptions through and over said bridge to Council Bluffs under one uniform time-schedule with the remainder of their road, and to

desist and refrain wholly from operating said last-mentioned portion of said road as an independent and separate line, and from causing freight or passengers bound westward or eastward to be transferred at Omaha, or to show cause why they did not obey the writ.

To the alternative *mandamus* the railroad company put in a return, which was met by an answer filed by the relators; and the case was heard by the Circuit Court on the facts stated in the writ, the return, and the answer (the averments of the answer not being controverted), and a peremptory *mandamus* was ordered. It is of this final judgment that the plaintiffs in error now complain.

The obligation of the Union Pacific Railroad Company to operate their road as a continuous line, throughout its entire length, is not denied. The company is a creature of congressional legislation. It was incorporated by the act of Congress of July 1, 1862 (12 Stat. 489); and its powers and duties were prescribed by that act, and others amendatory thereof. By the twelfth section it was enacted that the "whole line of the railroad and branches and telegraph shall be operated and used for all purposes of communication, travel, and transportation, so far as the public and government are concerned, as one connected, continuous line." A similar requisition was made in the fifteenth section of the amendatory act of July 2, 1864. 13 Stat. 356. The contest in the case does not relate to the existence of this duty: it is principally over the question, whether the railroad bridge over the Missouri River, between Omaha in Nebraska and Council Bluffs in Iowa, is a part of the Union Pacific Railroad; for, if it is, there can be no doubt that the company are required by law to use it in connection with, and as a part of, their entire road, operating all parts together as a continuous line.

The answer to this question must be found in the legislation of Congress, and in what has been done under it. By the first section of the act of 1862, the Union Pacific Railroad Company was authorized to construct, maintain, and enjoy a continuous railroad and telegraph, with the appurtenances, from a point on the one hundredth meridian of longitude west from Greenwich to the western boundary of the Territory of Nevada. There it

was intended to meet and connect with the line of the Central Pacific Railroad Company of California (sect. 8), thus forming a continuous line to the Pacific Ocean. This was the main line. But the same act made provision also for several eastern connections. The ninth section authorized the Leavenworth, Pawnee and Western Railroad Company of Kansas (now the Kansas Pacific) to construct a railroad from the Missouri River, at the mouth of the Kansas River (on the south side thereof, so as to connect with the Pacific Railroad of Missouri), to the point of western departure of the Union Pacific on the one hundredth meridian. Thus provision was made for an eastern connection by an unbroken line of road to St. Louis on the Mississippi. This was not all. By the fourteenth section of the act the Union Pacific was authorized and required " to construct a single line of railroad and telegraph from a point on the western boundary of the State of Iowa, to be fixed by the President of the United States, . . . so as to form a connection with the lines of the said company at some point on the one hundredth meridian of longitude aforesaid, from the point of commencement on the western boundary of the State of Iowa." Thus provisions were made for the Iowa eastern branch of the main line. It was doubtless intended to render possible a connection with any railroad that might thereafter be constructed from the western boundary of Iowa eastward. None was then completed ; but a railroad was in progress of construction through the State, from its eastern border to the Missouri River.

The fourteenth section also made provision for another eastern connection. It enacted, that whenever there should be a line of railroad completed through Minnesota or Iowa to Sioux City, then the said Pacific (Union Pacific) Railroad Company should be authorized and required to construct a railroad and telegraph from said Sioux City, so as to connect with the Iowa branch, or with the main line, at a point not farther west than the one hundredth meridian of longitude.

The scheme of the act of Congress, then, is very apparent. It was to secure the connection of the main line, by at least three branches, with the Missouri and Iowa Railroads, and with a railroad running eastwardly from Sioux City in Iowa, either through that State or through Minnesota. An observ-

ance of this scheme, we think, will aid in considering the inquiry at what place the act of Congress, and the orders of the President made in pursuance thereof, established the eastern terminus of the Iowa branch. From it may reasonably be inferred that the purpose of Congress was to provide for connections of the branches of the main line of the Union Pacific road with railroads running through the States on the east of the Territory, and to provide for those connections within those States, at points at or near their western boundaries. Thus the northern branch was required to be constructed from Sioux City (which is in the State of Iowa) westward toward the main line; and the southern branch was authorized to build their railroad from the south side of the Kansas River, at its mouth, so as to connect with the Pacific Railroad of Missouri. If, now, the provisions of the act respecting the central or Iowa branch be examined, the same purpose is evident. Those provisions are found in the fourteenth section, and they are as follows:—

" And be it further enacted, That the said Union Pacific Railroad Company is hereby authorized and required to construct a single line of railroad and telegraph from a point on the western boundary of the State of Iowa, to be fixed by the President of the United States, upon the most direct and practicable route, to be subject to his approval, so as to form a connection with the lines of the said company at some point on the one hundredth meridian of longitude aforesaid, from the point of commencement on the western boundary of the State of Iowa."

This clause contains the only provisions of the act respecting the eastern terminus of the Iowa branch, and it twice defines that terminus as " a point on the western boundary of the State of Iowa." The legal boundary of the State is the middle of the channel of the Missouri River. 9 Stat. 52. But it is very evident that Congress did not intend that the road should start from a point in the mid-channel of the river. That would be impossible; and, were it possible, it would not carry out the general design of the act, which, as we have seen, was to provide for connections with the eastern railroads then in existence or contemplated. It is conceded by the counsel of the company that Congress ought not to be held to have intended to fix the initial point in the mid-channel of the river, exactly

on the line which is the legal boundary of the State. Such a construction of the law, it is acknowledged, would be unreasonable, because it would involve the requirement of an impossibility. But, if Congress'did not mean to require a construction of the railroad from the imaginary line which is the legal boundary of Iowa, — namely, from the mid-channel of the river, — they must have intended the initial point to be either on the Iowa shore or on the Nebraska shore. If the Nebraska shore was intended, why was it not mentioned ? Why was not the west bank of the Missouri River designated ? or why was not the eastern boundary of Nebraska fixed as the point of departure ? Still more, why was Iowa mentioned at all ? or why was the initial point described as a point on the western boundary of Iowa ? It is impossible to give a satisfactory answer to these questions, if the eastern or Iowa shore of the river was not intended to be the terminus of the railroad. Unless it was so intended, no reason is found in the acts of Congress for mentioning Iowa at all. The western shore of the river is no nearer the western legal boundary of Iowa than the eastern shore is; while the latter is, in common understanding, the western boundary of the State. Congress may well be supposed to have used language in accordance with the common understanding. It is common usage to speak of the boundary of a state or county as a river, though the legal boundary may be the middle of the river; and particularly when any thing is to be constructed on such a boundary, which from its nature must be constructed on dry land, would no one understand the place of construction as any other than the shore of the river. It is perfectly legitimate and in accordance with every-day usage to say that a house built in Illinois on the eastern shore of the Mississippi stands on the western boundary of the State, though the legal boundary of the State is the mid-channel of the river. In common understanding, therefore, a point on the western boundary of Iowa would be a point in Iowa on the eastern shore of the Missouri, precisely as a point on the eastern boundary of Nebraska would be understood to be in Nebraska, on the western shore of the river. The words " on the boundary of Iowa " are not technical words; and therefore they are to be taken as having been used by Congress in their ordinary signification.

Instances are not rare in which statutes have been construed, not literally, but in accordance with the common use of the language employed by the law-makers. Authority to construct a railroad or turnpike from A. to B., or beginning at A. and running to B., is held to confer authority to commence the road at some point within A., and to end it at some point within B. The words "*from*," "*to*," and "*at*," are taken inclusively, according to the subject-matter. 1 Mas. 126; 1 Stra. 179; *Farmers' Turnpike* v. *Coventry*, 10 Johns. 389. So in the case of *The Mohawk Bridge Company* v. *The Utica and Schenectady R.R. Co.*, 6 Paige, 554, a similar ruling was made. The city of Schenectady was on the south bank of the Mohawk River, the north bounds of the city being the middle of the channel of the river; yet it was held that a railroad company authorized to build a railroad "commencing at or near the city of Schenectady, and running thence on the north side of the Mohawk River," was by those words empowered to build a bridge over the Mohawk, and commence their railroad at or within the city. These decisions bear some analogy to the construction given by the Circuit Court to the phrase "on the western boundary of Iowa;" and that construction is the only one consistent with the paramount purpose manifested in the act of Congress, to provide for connections with the railroads of the States east of Nebraska Territory, — a purpose to which we have already referred. Unless the Iowa branch of the Union Pacific was intended to commence on the Iowa shore of the Missouri River, its connection with the Iowa railroads would have been impossible. Those roads could not be extended to the Nebraska shore; for the State of Iowa was without power to authorize the erection of a bridge over the river, or even the establishment of a ferry. We do not propose to enter upon a consideration of the question, whether Congress had power to authorize the construction of railroads within a State: it is not necessary for the present case. Even the appellants would shrink from denying the lawful existence of their bridge. What is to be sought now is the intention of Congress, not its power. Did Congress intend the place of connection to be on the eastern shore of the river? That they did is manifest, if they intended any connection; for no other was possible, either with or without the co-operation of Iowa.

In accordance with this understanding of the act of 1862 was the action of the President. The fourteenth section of the act required the company to construct the Iowa branch from a point on the western boundary of Iowa, *to be fixed by the President of the United States.* In discharging the duty thus imposed, the President, by an executive order, dated Nov. 17, 1863, fixed so much of the western boundary of the State of Iowa as lies between the north and south boundaries of the United States township within which the city of Omaha is situated as the point from which the line of railroad and telegraph should be constructed. This designation was, in one particular, indefinite. While it adhered to the western boundary of Iowa, it left undetermined at what place on that boundary the initial point should be, except that it should be somewhere between the north and south boundaries of a township, those boundaries being six miles apart. The President, therefore, on the seventh day of March, 1864, by a second executive order, made a more definite location. By that order he designated and established the point from which the railroad company was authorized to construct the road as a point " on the western boundary of Iowa east of and opposite to the east line of section 10, in township 15, north of range 13, east of the 6th principal meridian, in the Territory of Nebraska." Section 10 is a fractional section, its eastern boundary being the Missouri River. That the President understood this designation as fixing the point on the eastern shore of the river, and within the State of Iowa, is manifest from the message which, two days afterwards, he sent to Congress accompanying a copy of his official orders, in which he declared that the orders fixed the point on the western boundary of Iowa, " within the limits of the township in Iowa opposite the town of Omaha, in Nebraska." And such appears to be the plain meaning of the executive orders. The point could not have been " east of and opposite to the east line of section 10, in township 15 " (the section spoken of), if it was on the western shore of the river. It would then have been in Nebraska. The designation by the President was thus in strict conformity with the act of Congress; for, whenever that act spoke of the terminus of the Iowa branch with reference to its location, it described it, not as being in Nebraska, not even as

being in the Missouri River, but as on the western boundary of Iowa.

Thus far we have confined our attention to the act of 1862, and to the President's action under it.   From that act alone we have deduced the conclusion that the company was authorized and required to build their railroad to the Iowa shore. That authority included within itself power to build a bridge over the Missouri.   No express grant to bridge the river was needed.   Whatever bridges were necessary on their line were as fully authorized as the line itself; and the company were as much empowered to build one across the Missouri as they were across the Platte or any other river intersecting the route of their road.   *People* v. *The Saratoga & Rensselaer R.R. Co.*, 15 Wend. 130; *Springfield* v. *Connecticut River R.R. Co.*, 4 Cush. 63; *Mohawk Bridge Co.* v. *Utica & Schenectady R.R. Co.*, *ut supra.*

But the amendatory act of 1864 is not to be overlooked.   It is to be regarded in connection with the act of 1862, and interpreted as a part of it.   By its ninth section the company were expressly authorized to construct bridges over the Missouri, and other rivers which their road might pass in its course, for the convenience of their road; and the act declared this authority to be given to enable the company to make convenient and necessary connections with other roads.   This enactment may not have been necessary.   The power may have been conferred upon the Union Pacific Railroad Company by the act of 1862; and we think it was.   But, whether necessary or not, it shows clearly that Congress had in view the construction of the railroad to the Iowa shore of the river.   No bridge could be constructed without making use of the Iowa shore.

It is well to observe here that the authority was given to the company as a railroad company, and not as a bridge company. The bridge was for the convenience of their road, and to enable them to connect it with other roads.   They could build it for no other uses.   They were not authorized to use it for other purposes than those of their road.   They were not allowed to charge rates of toll which they did not charge upon other portions of their line.   If they acquired such a right, it was by subsequent legislation, — by the act of 1871, to which we shall

refer hereafter; but if, under the acts of 1862 and 1864, the company were authorized to build a railroad bridge across the river, and if such bridge was a part of their road, and not another railroad, the conclusion is irresistible that their road was intended to have its eastern terminus on the Iowa shore of the river.

It is no answer to this to urge that Congress could not have intended to invade a State by chartering a company to build a railroad in part within the State limits. The stubborn fact remains, that Congress did authorize the building of a railroad bridge on land within the territorial limits of the State, and, as necessarily incidental to that, a railroad upon the necessary approaches to the bridge. So, also, Congress authorized building a railroad from Sioux City, in Iowa, across the Missouri River westward. The statute does show a plain intention that the company's railroad should enter the State under its authority; and the twelfth section enacted what should be done whenever the route of the road should cross the boundary of any *State* or Territory, and authorizes the President of the United States, in case the companies met there and disagreed respecting the location, to determine it.

Our attention has been called to other clauses in the acts of 1862 and 1864, in which the road is spoken of as from the Missouri River to the Pacific coast, or to the navigable waters of the Sacramento, or from Omaha, as indicating that the eastern terminus was intended to be Omaha, or the western shore of the Missouri River. But these clauses have other objects in view than designating the terminus of the road. They are descriptive of the road, but not of its beginning or ending. Whenever the attention of Congress was turned to the eastern terminus alone, and the purpose was to determine its location, there is no variance in the language employed. It is always " a point on the western boundary of Iowa." The different forms of expression employed in other sections and for other purposes can have no bearing upon the question.

Again: it is claimed that the contemporaneous construction given to the charter of the company, by its officers and by the officers of the government, tends to show that the terminus was fixed by the statute on the Nebraska side of the river. It

must be conceded, that, in a case where the interpretation of an instrument is doubtful, the practical construction given to it by the parties is of weight. But we do not discover that the United States government, or its officers, ever acted upon the theory that the eastern terminus of the road was on the western shore of the river. The officers of the company asserted it for a time, it is true, but not in their practical intercourse with the national government. Indeed, it never became a practical question until the bridge was erected; and from that time to the present the government has asserted that the true terminus of the road was fixed on the Iowa shore. There is nothing, we think, in any contemporaneous construction given to the acts of Congress, which ought to have any weight in determining the question now before us.

Our conclusion, therefore, is, that the initial point of the Iowa branch of the Union Pacific Railroad was fixed by the act of Congress on the Iowa bank of the Missouri River.

If we are correct in this conclusion, it seems to be clear that the bridge over the river, built by the railroad company, is a part of their railroad, and required by law to be so operated. It was commenced in 1869 under the acts of 1862 and 1864. These acts were the only authority the company had at the time of its commencement for building it. It is a railroad bridge, a continuation of the line west of the river; and it connects the road with its required eastern terminus. The acts chartering the company manifest no intention to distinguish between the bridge over the Missouri River and other bridges on the line of their road. If it is not a part of their road, neither is any bridge between the Missouri and the western boundary of Nevada; for the power to build all bridges was given in the same words.

It has been argued, however, that the bridge is not a part of the company's railroad, because it is not located opposite section 10, east of and opposite to which, on the western boundary of Iowa, the President fixed the terminus. It is, however, the only bridge the company has extending their road to the western boundary of Iowa; and clearly they have no authority to build any other. True, it is not opposite section 10; but the company has taken up its road from that section, and now it comes

to the river where the bridge is actually constructed. Having abandoned their road, so far as it extended above that point; having commenced their bridge where it is; having applied to Congress for power to mortgage it, and for special power to levy tolls and charges for the use of it; and having obtained those powers, — they are not at liberty now to assert that they have located their bridge at the wrong place. There is nothing, either in the act of 1862 or 1864, or in that of Feb. 24, 1871, which empowers them to build more than one bridge over the Missouri for the Iowa branch; and the latter act contains an implied recognition of their right under the former acts to build their bridge on its present location. There is no intimation in it of a distinct bridge franchise. It grants no power to build a bridge. Its main purpose manifestly was to give the company additional means and privileges for the completion of a structure already authorized, not to enable them to construct a new and independent road. To hold that the bridge is not a part of the road would defeat the plain object Congress had in view in 1862 and 1864, — a continuous line for connection with the Iowa roads. It would be allowing the connection to be made in Nebraska, instead of on the western boundary of Iowa, when the act of 1871 expressly declared that nothing therein should be so construed as to change the eastern terminus of the Union Pacific Railroad from the place where it was then fixed by existing laws. Indeed, that proviso was quite unnecessary if the bridge was not thought to be a part of the railroad connecting the other part with the western boundary of Iowa.

Holding then, as we do, that the legal terminus of the railroad is fixed by law on the Iowa shore of the river, and that the bridge is a part of the railroad, there can be no doubt that the company is under obligation to operate and run the whole road, including the bridge, as one connected and continuous line. This is a duty expressly imposed by the acts of 1862 and 1864, and recognized by that of 1871. What this means it is not difficult to understand. It is a requisition made for the convenience of the public. An arrangement, such as the company has made, by which freight and passengers destined for or beyond the eastern terminus are stopped two or three miles from it and transferred to another train, and again transferred

at the terminus, or by which freight and passengers going west from the eastern end of the line must be transferred at Omaha, breaks the road into two lines, and plainly is inconsistent with continuous operation of it as a whole.  If not, the injunction of the statute has no meaning.  The *mandamus* awarded in this case, therefore, imposes no duty beyond what the law requires.

Such is our opinion of the merits of this case.  A single objection made and urged against the form of proceeding remains to be considered.  The appellants contend that the court erred in holding that Hall and Morse, on whose petition the alternative writ was issued, could lawfully become relators in this suit on behalf of the public without the assent or direction of the Attorney-General of the United States, or of the district attorney for the district of Iowa.  They were merchants in Iowa, having frequent occasion to receive and ship goods over the company's road; but they had no interest other than such as belonged to others engaged in employments like theirs, and the duty they seek to enforce by the writ is a duty to the public generally.  The question raised by the objection, therefore, is, whether a writ of *mandamus* to compel the performance of a public duty may be issued at the instance of a private relator.  Clearly in England it may.  Tapping on Mandamus, p. 28, asserts the rule in that country to be, that, "in general, all those who are legally capable of bringing an action are also equally capable of applying to the Court of King's Bench for the writ of *mandamus*."  This is true in all cases, it is believed, where the defendant owes a duty, in the performance of which the prosecutor has a peculiar interest; and it is equally true, we think, in case of applications to compel the performance of duties to the public by corporations.  In *The King* v. *The Severn & Wye Railway Co.*, 2 Barn. & Ad. 646, a private individual, without any allegation of special injury to himself, obtained a rule upon the company to show cause why a *mandamus* should not issue commanding them to lay down again and maintain part of a railway which they had taken up.  Under an act of Parliament, the railway was a public highway; and all persons were at liberty to pass and repass thereon, with wagons and other carriages, upon payment of the rates.  What the prosecutor complained of was the loss by the public, and

particularly by the owners of certain collieries (of which he does not appear to have been one), of the benefit of using the railway taken up. The writ was awarded. It was not even claimed that the intervention of the Attorney-General was needed. Other cases to the same effect are numerous. *Clarke* v. *The Leicestershire & Northamptonshire Union Canal Co.*, 6 Ad. & El. N. s. 898; 1 Chit. 700.

In this country there has been diversity of decision upon the question whether private persons can sue out the writ to enforce the performance of a public duty, unless the non-performance of it works to them a special injury; and in several of the States it has been decided that they cannot. An application for a *mandamus*, not here a prerogative writ, has been supposed to have some analogy to a bill in equity for the restraint of a public nuisance. Yet, even in the supposed analogous case, a bill may be sustained to enjoin the obstruction of a public highway, when the injury complained of is common to the public at large, and only greater in degree to the complainants. It was in the *Wheeling Bridge Case*, 13 How. 518, where the wrong complained of was a public wrong, an obstruction to all navigation of the Ohio River.

The injury to the complainants in that case was no more peculiar to Pennsylvania than is the injury to Hall and Morse in this peculiar and special to them.

There is, we think, a decided preponderance of American authority in favor of the doctrine, that private persons may move for a *mandamus* to enforce a public duty, not due to the government as such, without the intervention of the government law-officer. *People* v. *Collins*, 19 Wend. 56; *County of Pike* v. *The State*, 11 Ill. 202; *Ottawa* v. *The People*, 48 id. 233; *Hamilton* v. *The State*, 3 Ind. 452; *Hall* v. *The People*, 57 N. Y. 307; *People* v. *Halsey*, 37 id. 344; *State* v. *The County Judge of Marshall*, 7 Iowa, 186; *State* v. *Railway*, 33 N. J. Law, 110; *Watts* v. *Carroll Parish*, 11 La. Ann. 141. See also Dillon on Mun. Corp., sect. 695, and High on Ex. Rem., sects. 431, 432; *Cannon* v. *Janvier*, 3 Houst. 27; *State* v. *Rahway*, 33 N. J. Law, 110. The principal reasons urged against the doctrine are, that the writ is prerogative in its nature, — a reason which is of no force in this country, and no longer in England, — and

that it exposes a defendant to be harassed with many suits. An answer to the latter objection is, that granting the writ is discretionary with the court, and it may well be assumed that it will not be unnecessarily granted.

There is also, perhaps, a reasonable implication that Congress, when they authorized writs of *mandamus* to compel the Union Pacific Railroad Company to operate their road according to law, did not contemplate the intervention of the Attorney-General in all cases. The act of 1873 does not prescribe who shall move for the writ, while the Attorney-General is expressly directed to institute the necessary proceedings to secure the performance of other duties of the company. For these reasons, we think the Circuit Court did not err in holding that Hall and Morse were competent to apply for the writ in this case.

*The decree of the Circuit Court is affirmed.*

MR. JUSTICE BRADLEY dissenting.

I am obliged to dissent from the judgment of the court in this case. The Missouri River is, by common acceptation, the western boundary of Iowa; and the fair construction of the charter of the Union Pacific Railroad Company, which adopts that boundary as its eastern terminus, is, that the road was to extend from the Missouri River westwardly. The subsequent express authority given to construct a bridge across the river, in my judgment, confirms this view of the subject; and as a *mandamus* is a severe remedy, requiring a clear right and clear duty to support it, I think it ought not to be granted in this case, especially as it requires the company to use the bridge as a part of their continuous line with all their trains, which may impose much inconvenience on them, without corresponding benefit to the public.