## TAXATION OF RAILROADS.

[Superior Court of Cincinnati, General Term.]

THE CINCINNATI, NEW ORLEANS & TEXAS PACIFIC RAILWAY CO.
v. RUDOLPH K. HYNICKA, TREASURER OF HAMILTON
COUNTY, OHIO.

Decided, September 13, 1906.

*Taxation—Railway Property Taxable as a Unit—Property Which May
be "Localized"—Bridges, Viaducts, Trestles, Side-tracks, Slopes,
Freight Yards, and Ground Purchased for Connection Tracks—Sec-
tions 2770 to 2776—Powers of Auditor under Section 2781a.*

1. In entering for taxation the property of a railroad which lies partly
   within and partly without the state, Sections 2772 and 2776 should
   govern, and not Section 2774.
2. The bridge of the Cincinnati Southern Railway, which spans the
   Ohio river, together with the viaduct or trestle leading up to it,
   constitutes, with the underlying ground, a part of the road-bed,
   and is property necessary to the daily operation of the road, and
   there being no additional charge to shippers or passengers on
   account of the use of this bridge and viaduct, it should be taxed
   with the remainder of the road as a unit and "averaged" over the
   entire road.
.3. The side-tracks of the company, which are in daily use for the
   loading and unloading of freight, and ground purchased for the
   purpose of establishing a connection track with another railroad,
   do not constitute real estate, structures, or stationary personal
   property to be "localized" for taxation, but should likewise be
   "averaged" for taxation over the entire road.
4. Such being the status of railroad property of this character, the
   auditor can not, after having ascertained its value under Section
   2772, again tax it as omitted property; nor can he treat it as
   omitted property which has escaped taxation; nor would he be
   justified in again placing it on the duplicate on the ground that
   his action was in effect a revaluation or a correction of an under-
   valuation.

HOFFHEIMER, J.; FERRIS, J., concurs; HOSEA, J., concurs in a
separate opinion.

This was an action to enjoin the treasurer of Hamilton county
from collecting taxes on certain additions made by the auditor
to the tax duplicate on property of plaintiff for the years 1891
to 1899, inclusive.

The cause was reserved to the general term for decision. The plaintiff is the lessee of the Cincinnati Southern Railway, a line built and owned by the city of Cincinnati. The road, as is well known, extends from the city of Cincinnati, Ohio, to the city of Chattanooga, Tenn. Under the lease of said road the lessees pay all the taxes. The agreement includes the years for which the additional taxes herein are sought. During these years, namely, 1891 to 1899, both inclusive, plaintiff made to the auditor of Hamilton county, on printed forms furnished for that purpose by the auditor of state, returns of its taxable property. The statements for the respective years consist of several schedules. According to *Schedule E* (for the years 1892 to 1899) the company returned: "*Tracks, including road-bed, right of way, etc., owned or held by said company in the state of Ohio as exist on said date.*" The return for 1891, although different in form, is to the same effect, substantially. Under the schedule the plaintiff stated it had 56-100 of a mile of main track in Ohio, and it placed a value thereon of $12,000 per mile, and that it had side-tracks to the extent of 10.19 miles (in 1891), increasing gradually, however, throughout said years to 11.180 miles (in 1899), upon which it placed a valuation of $2,000 per mile. The evidence shows that the auditor, acting as the board of appraisers and assessors for said railway company, fixed the valuation of the main track at $12,000 per mile, and the side-track at $2,000 per mile for the years in question (Bill of Evidence, page 201, defendant's exhibit 3), and accordingly such valuations were placed upon the duplicate, and taxes were duly paid by plaintiff. The stem or main track of the railroad begins, as shown by the evidence, at Gest street, in the city of Cincinnati, and approaches and crosses over the Ohio river by means of a trestle and bridge structure, built by the Trustees of the Southern Railway expressly for that purpose. The trestle structure is about 1,299 feet in length, and the bridge structure on the Ohio side about 1,233 feet in length, and both are described as numbers 1 and 10 in the petition. The bridge and trestle occupy the lots numbered in the petition 2 to 9 (pages 2 and 3), also 11 to 16 (pages 4 and 5) inclusive. The evidence shows that all these lots are necessary for the maintenance of said bridge and trestle. The "side-tracks" in question are built on lots number 5 to 9, also

4 to 35, described in the petition number 1 to 35, inclusive (pages 5 to 9). The parts of said lots not covered by rails are used as "slopes" to support the tracks, and also for the loading and unloading of freight, in the daily operation of the business. The eight parcels of ground described in the petition as lots 1 to 8 (pages 10 and 11), all the evidence shows, were acquired by the trustees to establish a connection with the C., H & D. Railroad. The ground lies very low, and a considerable fill will be required to make said lots available· for said purpose. At the time in question the fill had not been made, nor was the connection made, nor were said lots used for purposes other than those of the railroad. In 1899 the auditor claimed that the bridge and trestle, and several lots thus briefly referred to, were "lands, town lots or improvements, structures or fixtures thereon, subject to taxation within this county"; that same had not been returned by the assessor or had escaped taxation through error of the auditor. He therefore proceeded to ascertain the value of the bridge, trestle and lots as separate items and placed the entire sum on the duplicate, claiming that the true value of said property was $265,580 more for each year in question than the value returned, assessed and taxed. Upon this valuation he added taxes as far back as the last decennial appraisement, inclusive of 1891, in all in the sum of $64,567.79, and also penalties. Thereupon plaintiff brought this action to enjoin the collection of said taxes, and a temporary order was allowed by the court below.

In 1900, the auditor, without removing from the duplicate of real estate the additions thus made by him, put the foregoing described property on the duplicate as *personal* property also, and added simple taxes for the five years, including and preceding the year 1899 in the sum of $42,514.03, and also penalties. The plaintiff by supplemental petition thereupon asked that the collection of the additional taxes be enjoined, and again a temporary restraining order was allowed.

Under the issues the question is, Was the auditor's action in thus attempting to separately tax the property involved valid or invalid? The plaintiff claims it was invalid, because, it is urged, the *bridge and trestle* and *side-tracks* and *lots*, more specifically described in the petition were *"road-bed"* and *"property necessary to the daily operation of the road,"* and was

therefore taxable as a unit; that is to say, averaged over the entire road. In accordance with this theory its returns for taxation were made. On the other hand, defendant contends that the statutes (particularly Section 2774) with reference to the taxation of railroad property, contemplate two distinct classes: (a) a class to which belongs main track, rolling stock, road-bed, supplies, money and credits; (b) the class to which belongs real estate, structures and stationary personal property. And defendant claims that the property of Class A is property that may be "spread out," or apportioned over the entire road for taxation, while that of Class B is property that is to be *localized* for taxation. Defendant contends that the property involved in this action all falls in the latter class, and was therefore to be locally taxed, either as personalty or as real estate, whichever it may be found to be. A determination of the questions presented involves Sections 2770 to 2776 of the Revised Statutes, which are the sections relative to the taxation of railroad property. The Cincinnati Southern Railway, which is the property operated by plaintiff, the lessees of the trustees of the city of Cincinnati, is not wholly within the state of Ohio, but is partly within that state (only in the county of Hamilton) and partly without the state. In taxing the property of such a railroad, we are of opinion that Sections 2772 and 2776 in particular govern, and not Section 2774. Section 2772 is as follows:

"It shall be the duty of each board to meet in the month of May in the present and each succeeding year, at such time as the president thereof may appoint; and if no meeting be appointed by him before the second Tuesday in May, the several county auditors shall meet on that day in the place where the proper railroad for which said auditors constitute the board as aforesaid, has its principal office, or in the principal city or village upon the line of such road, as the case may be, and proceed to ascertain all the personal property, which shall be held to include road-bed, water and wood stations, and such other realty as is necessary to the daily running operations of the road, moneys and credits of such company, and the undivided profits, reserve or contingent fund of such company, whether the same may be in money, credits, or in any manner invested, and the actual value thereof in money."

By this section the board is required to ascertain all the *personal property of the railroad*. The section, it will be observed,

also describes with particularity what the *personal property* consists of:

"It shall be held to include *road-bed,* water and wood stations *and such other realty as is necessary to the daily* running operations of the road."

Section 2776 is as follows:

"When any railroad company has part of its *road* in this state and part thereof in another state or states, the proper board shall take the value of *such property,* moneys and credits of such company so found and determined, as aforesaid, and divide it in the proportion the length of such road in this state bears to the whole length of such road, and determine the principal sum for the value of such road in this state accordingly, equalizing the relative value thereof in this state as above provided."

This section, it is evident, has reference to a railroad that has part of its *road* in this state and part thereof in another state or states. In our opinion the words *"such property"* refer back to Section 2772, and *"such property"* shall be distributed for taxation, in the proportion the length of such road bears to the whole length of such road and determine the principal sum for the value of such road in this state accordingly." The *"such property"* (personal property under Section 2772) here referred to therefore includes *"road-bed"* and *"realty necessary to the daily running operations of the road."* In other words, "road-bed" and "other realty necessary to the daily running operations of the road" are made personal property for taxation purposes. Such being the construction to be placed on said statutes, the question would be: Is this bridge structure or trestle and the ground on which it rests road-bed and realty necessary to the daily running operations of the road? The uncontroverted evidence shows it is property necessary to the daily running operations of the road. Indeed, counsel for defendant admit such to be the fact. Courts of dernier resort in several of the states and the Supreme Court of the United States have many times held that a bridge or structure built for purposes such as the one in controversy is a necessary part and parcel of the road itself; that it is "road-bed." In the language of Justice Gray it may be said to be, "Railway viaduct rather than a bridge." "It is a road built over water instead of on land." *Railway Co. v. Keokuk Bridge Co.,* 131 U. S., 371.

See, also, *State, ex rel Tillery,* v. *Hannibal & St. Joe R. R. Co.,* 97 Mo., 348; *People* v. *I. C. R. R. Co.,* 215 Ill., 177; *Schmidt, Collector,* v. *Galveston, Harrisburg & San Antonia Railroad Co.,* 24 Southwestern Rep., 547; *St. Louis & San Francisco Railroad Co.* v. *Williams,* 53 Ark., 58; *State Central Railroad Co.* v. *Mutchler,* 41 N. J. L., 96; *People* v. *Atchison, Topeka & Santa Fe Railroad Co.,* 206 Ill., 252; *Anderson* v. *C., B. & Q. Railroad Co.,* 117 Ill., 26; *Chicago, St. Louis & New Orleans Railroad Co.* v. *Commonwealth,* 115 Kentucky, 278; *Union Pacific Railroad Co.* v. *Hall,* 91 U. S., 343.

These authorities would seem to be decisive, but defendant, in combating the contention of plaintiff, relies on *Cowen* v. *Aldridge,* 114 Fed. Rep., 44, and insists that said case is decisive of the claim here made by the treasurer, namely, that Section 2774 governs the taxation of this bridge structure and the remainder of the property here involved, and that the property in controversy falls within Class B (*supra*). Even if we were to hold that Section 2774 was applicable and controlling we fail to see, in view of the construction placed upon that section by our Supreme Court, how such position could avail defendant. In *Railroad* v. *Commissioners,* 48 O. S., 251, speaking in regard to Section 2774, Bradbury, J., said:

"This section provides that such proportion of the entire property of the railroad (except realty not necessary to its daily running operations) shall be taxed in each district through which it runs, as the length of the road in such district bears to its whole length."

The class, therefore, into which defendant insists the property in controversy belongs (property to be localized) *is realty not necessary to the daily running operations of the railroad.* Obviously the property in controversy can not belong to that class because as we have seen it is admittedly property necessary to the daily running operations of the railroad. For this reason *Cowen* v. *Aldridge* is not in point. In the next place, the facts in *Cowen* v. *Aldridge* were so essentially different from those in the case at bar that a close reading of that case will reveal why the court held the "bridge" taxable as a bridge (it was not road-bed) and property to be localized. In the Bellaire case (*Cowen* v. *Aldridge*) the bridge was not, as a matter of fact, a necessary

part of the railroad proper. It was built to connect two railroads, the Central Ohio Railroad Co., which had its railroad on the Ohio side of the river, and the Baltimore & Ohio Railroad Co., whose railroad is built to the east side of the Ohio river; that is to say, on the side opposite. The bridge connects two populous towns, and the evidence shows that heavy additional charges were made to passengers and shippers of freight. The bridge may be said to have had a business, and a financial as well as legal character clearly distinguishable from "main track" laid upon it. It had, aside from its use for main track, other distinguishing and valuable uses. The bridge in the case at bar was built by the Trustees of the Southern Railway as part and parcel of said railway, and in order to permit its trains to go from the terminal in Ohio to the terminal in Chattanooga. The trustees had no power to build a bridge for any other purpose than that of a railroad. They certainly had no power to build a bridge for use as a bridge independently of the necessary road-bed. (On this point see *Union Pacific Railroad Co. v. Hall*, 91 U. S., 343-350-351). And furthermore the testimony shows the bridge was adopted for and to be used for the purposes of a railroad solely. True, it appears that the lessees have built a footpath at the expense of the citizens of Ludlow, and it seems a nominal sum is collected for the purpose of keeping said footpath in repair, but in our judgment the power given the trustees to build this bridge, the purpose for which it was built and its use under the law indicate the true character of this bridge for the purpose of determining the legal question as to the manner in which the same shall be taxed, and the mere incident of the building of this footpath by the lessee can not alter the true character of the structure for taxation purposes. It is also clear that, as far as this railroad is concerned, no additional charges are exacted of shippers or passengers, and the mileage on this bridge is treated by the railroad precisely as is every other mile of road. (See the testimony of Mr. Nicholson.) That the *character* of the bridge in *Cowen* v. *Aldridge* was a vital consideration is evident by what the court says at page 50:

"Additional rates are charged to passengers and freight using the bridge. It has a distinct value as a bridge, irrespective of its present use for railroad purposes."

And again at page 52 the court says:

"It may be a practice to assess bridges as part of such main track of railroads in Ohio. It may be that many bridges have no value except to carry the track of the company. Whether this practice, if it exists, be right or wrong, is immaterial here in view of the character and ownership of the bridge in question."

It will be observed that not one of the authorities cited (*supra*) holding that a bridge is road-bed or part of the road was referred to by the Circuit Court of Appeals. The failure to take notice of these authorities can only be satisfactorily explained upon the theory that the facts in that case, as already indicated, stamp the Bellaire bridge with a character of its own—a thing separate and apart from the railroad. In short, it was a bridge pure and simple.

Finally, the decision in *Cowen* v. *Aldridge* is based solely on *Cass County* v. *C., B. & Q. Railroad Co.*, 25 Neb., 34. The court, in 114 Fed. Rep., at page 50, said (referring to the bridge in question):

"It is in our judgment a structure within the meaning of the statute and to be taxed as other local structures are in the district where it is situated. Similar considerations led the Supreme Court of Nebraska to like conclusions in a well considered case."

But the very case upon which *Cowen* v. *Aldridge* was based was itself subsequently overruled in *C., B. & Q. Railroad Co.* v. *Richardson*, 61 Nebraska, 515.

In view of these considerations therefore, and under the circumstances of the case at bar, whatever view may be taken of *Cowen* v. *Aldridge*, it would be manifestly unsafe to apply that decision. On the other hand, in view of the authorities herein cited, and especially mindful of the language of our Supreme Court in 48 O. S., 251, it seems to us a proper interpretation of the statutes involved would require that the term "road-bed" as used in the statute must be held to include a bridge, when that bridge, as in the case at bar, was built for and is used solely for the purpose of supporting the railroad tracks and is part and parcel of the road and is necessary to its daily running operations. Nor can we agree with defendant that this interpretation renders Section 2776 unconstitutional. This section has reference only, it will be noticed, to railroad property partly within

and partly without the state.  Our Constitution aims to tax all *property*.  The property of a railroad is not exempted by this section.  A railroad could not fairly be valued other than as a unit—as a continuous line.  This is necessarily so, and our state policy recognizes the fact.  The section refers only, as we have endeavored to show, to the *property* described in Section 2772. Merely because the section is silent as to the property of an interstate railroad which may have a fixed situs, and which may be found to be not "necessary to the daily running operation of the road" is no reason why said statute can be said to create an exemption as to such property.  The taxing statutes would reach such property.  One thing appears certain: Section 2776 does provide a method, a uniform mode of taxing the kind of property mentioned; that is to say, property necessary to its daily running. operation partly within and partly without the state, and such a system for taxing interstate railroads or companies has met the approval of the Supreme Court of the United States.  *Maine* v. *Grand Trunk Railway*, 142 U. S., 217; *Pittsburg Railway Co.* v. *Backus*, 154 U. S., 430; *Pullman Palace Car Co.* v. *Pennsylvania*, 141 U. S., 18.

In *Pittsburg Railway Co.* v. *Backus, supra,* the Supreme Court said:

"Nevertheless it is ordinarily true that when a railroad consists of a single continuous line, the value of one part  is fairly estimated by taking that part of the value of the entire road which is measured by the proportion of the length of the particular part to that of the whole road.  This mode of division has been recognized by this court several times as eminently fair."

Are the lots and portions of the streets upon which side-tracks are laid, separately taxable as the treasurer claims, or are they also to be considered "road-bed" and "realty necessary to the daily running operations of the road," and as such apportioned by mileage?  Under the evidence we find that the side-tracks and the lots on which they are laid are necessary to the daily running operations of the road, and we are of opinion that they; too, must be considered as road-bed, and not to be taxed as separate items.  In *Chicago & Auton Railway Co.* v. *The People*, 98 Ill., 350, the court said:

"We can see no reason why the term right of way should be confined to the land over which the main track of a railroad

should be constructed. The land upon which a side-track, a switch, or a turn-out is built, and in actual use by the company in the business for which it is organized for all practical purposes is as much held for right of way as is the land upon which the main track is constructed. In the operation of a railroad, it is necessary that trains should pass each other, and hence the necessity of turn-outs, switches and side-tracks. In the loading of cars, transfer of cars, the making up of trains and innumerable other instances that might be named in the prosecution of its business as a common carrier, side-track, switch or turn-out passes can be termed a proper transaction of its business as the main track itself. We are, therefore, of opinion that the land held and in actual use by the railroad company for side-tracks, switches and turn-outs must be regarded, within the meaning of the revenue law, as a part of the right of way of the company. It is used in the transportation of freight, and also for the purpose of carrying passengers alike with the land upon which the main track is constructed, and upon which principle the land upon which the main track is laid, can be held to be right of way and the land over which a side-track switch or turn-out passes can be termed something else, we are at a loss to understand. ''

See, also, *Chicago & Northwestern Railway Co.* v. *Miller*, 72 Ill., 144; *People* v. *The Board of Equalization*, 205 Ill., 296; *C., M. & St. P. Railway Co.* v. *Cass County*, 76 N. W., 239; *St. Louis, Iron Mountain & Southern Railway Co.* v. *Miller*, 67 Ark., 498; *Pfaff* v. *Terre Haute & Indianapolis Railway Co.*, 18 Ind., 144; *Burlington & Missouri River Railroad Co.* v. *Lancaster County*, 15 Neb., 251; *State* v. *Chicago, Rock Island & Pacific Railway Co.*, 162 Mo., 391. These authorities, we think, are decisive.

We likewise think that the parcels of ground (numbers 1 to 8) purchased for the purpose of making connections with the C., H. & D. Railway Company, was also properly returned for taxation by the railroad company and is not separately taxable. We find from the evidence that the lots were purchased for the purpose mentioned, and were to be used for such purpose and no other when filled; that such property devoted to such purpose is a part of the road as a whole, and was properly returned by the plaintiff company for taxes apportioned on the mileage basis, it seems to us, was decided in *Burlington & Missouri River Railroad Company* v. *Lancaster County*, 15 Neb.,

251 (18 N. W., 71), and also in *State* v. *Chicago, Rock Island & Pacific Railway Co.*, 162 Mo., 391. In the latter case it was held:

"[*Taxation.*] Switch-yards and other real property necessarily appurtenant to the railroad's efficient equipment as a means of traffic are not subject to taxation by the local authorities, but are to be included in that class of property which the statute requires to be assessed by the State Board of Equalization, and, although the railroad may have owned the lots for some years and as one yard and part of them for stock-yard purposes, yet, if it is used for no other purpose and does not appear to have acquired more land than was necessary for switch-yard purposes in view of the prospective growth of the city and the business, the property is to be assessed by the state board."

Finally, the property involved in this controversy was returned for taxation and the taxes found due thereon duly paid by plaintiff after the auditor, under and by virtue of Section 2772, had ascertained its value. The evidence shows that the auditor undertook to tax it again on the theory that it was *omitted* property. All the steps taken by him show that in the opinion of that officer, it was property that had *escaped taxation*. But as we have already pointed out, it did not escape taxation and could not be said to be omitted property. The only question remaining then would be: Was the auditor justified in again placing this property on the duplicate on the ground that his action was in *effect a revaluation* or *correction* of an undervaluation?

If the auditor has any such powers in respect to property of this character—property which according to law he had appraised and assessed in the first instance and no doubt correctly—that power is to be found in Revised Statutes, 2781*a*.

The exception engrafted upon the statute, it will be noticed, speaks only of *omitted* property; that is, property that has *escaped* taxation. Certainly, it was not intended that there should be a reassessment or a reappraisement of that which the officer had already appraised. Otherwise, as is pertinently asked by counsel for plaintiff, how many times is it necessary to assess railroad property? In our judgment this section gives the board *jurisdiction* to appraise and assess *omitted* property

and denies *jurisdiction* to reassess and reappraise that which has already been assessed according to law.

Moreover, it seems to us a conclusive answer to the assessment in this case is found in this fact that the auditor according to the evidence (page 183, Bill of Evidence) stated that in undertaking to make the revaluation *considered nothing outside of the county of Hamilton.* The auditor's action, therefore, even if he has power to reassess, was not such a reassessment as would be proper, because Section 2776, as we have seen, would make it imperative that property of an interstate railroad be apportioned by mileage. This was not done.

In conclusion, we find under the law and the evidence that the auditor in seeking to place this property on the duplicate as real estate under Section 2803, acted without authority. Section 2772 governed. When subsequently by virtue of Section 2781a, he again sought to place this property on the duplicate as ·personalty as *omitted* property, or as *revalued* or *reassessed* property, he again acted without legal jurisdiction. As stated, the railroad company made its returns according to law and paid the taxes contemplated by law on the property involved. It was, therefore, entitled to the injunction originally allowed, and we order the same to be made perpetual.

*Harmon, Colston, Goldsmith & Hoadly,* for plaintiff.

*Alfred B. Benedict,* for defendant.


Hosea, J.

I am in accord, in the main, with the views of my respected colleagues expressed in the foregoing opinion and with the results stated. It is perfectly clear to my apprehension that the bridge in question, with its approaches, is part of the roadbed—a "railway viaduct"—constituting part of the main thoroughfare and necessarily used in the "daily operations" of the road. That the value thereof is to be carried into the total and distributed to the counties for taxation, as provided by law, necessarily follows.

It is not so clear to my mind that a terminal yard and other structures for the storage of property and kindred uses, however convenient, and necessary for use in the general operation of the railway, are included in the intent of our tax statutes.

This language, when contrasted with the corresponding phrases in the taxation statutes of other states, under which the cited decisions were rendered, seems, at first blush, to have a limiting purpose that is not without strong reasons in its support. The phrase "*daily* running operations" of a railway, would seem to have direct reference to the actual running of trains and nothing more. The language chosen is at least strongly suggestive; and this view, it may be said, is more directly in accord with the reasons underlying the principle of distributive taxation of such property as is of a transitory or non-localized character. Indeed, the reasoning in *People* v. *State Board of Equalization*, 206 Ill., 296, seems to lay stress upon this characteristic even under statutory language of a broader scope. The same reasoning appears in *Chicago & Alton Railway Co.* v. *The People*, 98 Ill., 350, where thirty-two acres of railroad "yards" at Burlington, were held to belong to the distributable class under the statutory phrase "right of way." The court cites the necessity of side-tracks and turn-outs used to enable trains to pass each other and proceeds to class "yards" as within the intent of the law, by parity of reasoning, because necessary to the use and operation of the railway.

In the former case the yards at Chicago were held to be within the same principle of classification. But in these and other cases cited, the decisions rest upon statutes of broader definitions than our own—such as "track," "main track," and "right of way," used in the general operations of a railway. In contrast with these phrases the limitation to property required in the "*daily running operations*" of a railroad, seems to suggest a narrower definition, and it may be said that yards, used primarily for the storage of cars when not in use, fall without the limitation.

Much may be said on both sides of the question; but as the question, in its broader aspect as relating to the policy of taxation, is practically covered by the reasoning of courts of last resort in other states, and by the Supreme Court of the United States, upon the general principle involved, I am disposed, to the extent involved in the present controversy, to give my concurrence to the ruling of the majority, but with these suggestions.