THE PEOPLE OF THE STATE OF ILLINOIS, *ex relatione*
THE MERCHANTS' SAVINGS, LOAN AND TRUST COM-
PANY OF CHICAGO, *v.* THE AUDITOR OF PUBLIC
ACCOUNTS.

APPLICATION FOR MANDAMUS.

The act of February 8, 1861, transferring the proceeds of the two mill tax, to the revenue fund, is unconstitutional and void.

THE facts of the case are stated in the opinion.

BREESE, J.   At the January term, 1863, of this court, the
People of the State on the relation of the Merchants' Savings,
Loan and Trust Company of Chicago, filed a petition against
the auditor of public accounts of this State, for a mandamus,
in which it is alleged, that the relators are a corporation
organized and doing business under the laws of this State,
and that they are the legal holders of certain State indebted-
ness of this State, other than the canal and school indebted-
ness, namely : refunded stock to the amount of one hundred
and ninety-six thousand dollars, and were such owners and
holders on the first day of January, 1863.   That such
indebtedness is, and was, evidenced by the bonds or writings
obligatory of the State, sealed with the seal of the State, and
duly delivered to petitioners, a descriptive list of which is
attached.   That on the first day of January, they presented
these bonds to the auditor of the State, and demanded of him,
that he apportion the proceeds of the two mill tax assessed
and collected under the provisions of the fifteenth article of
the constitution, and under and by various acts of the legisla-
ture of the State, passed in furtherance of this article, among
the holders of State indebtedness presented to him on or
before that day for such purpose, and that he draw his war-
rant on the treasury for their respective proportionate share
of this fund, payable in gold or silver coin.   That they
offered to leave with the auditor, at the time of making this
demand, these bonds, for the purpose of having the proper
credits entered upon them, in obedience to the provisions of

the fifteenth article of the constitution, and of the laws passed in aid thereof, and that he declined to receive them.

The petition further alleges, that on the 2nd day of January, 1863, they applied to the auditor and demanded their *pro rata* share of all money then in the treasury, collected by virtue of that article and the laws, and he refused to issue his warrant therefor; that the auditor informed relators, that the legislature had expended the proceeds of the two mill tax, and further stated that about five hundred thousand dollars of that fund had been transferred, or loaned to the revenue fund, under an act of the legislature, and that he could not apply it, as they demanded of him. It further alleges, that there is now collected from the two mill tax, and in the treasury, five hundred thousand dollars, or thereabouts, which they insist should be distributed and paid to them and others, in compliance with the constitution and the law ; and averring that they have no legal remedy, save by the writ of mandamus, and the people pray, on this relation, that such writ may issue in the alternative, to the auditor, commanding him to apportion the proceeds of the two mill tax among the holders of all such State indebtedness, other than the canal and school indebtedness, as was, on or before the first day of January, 1863, presented to him for such purpose, and draw his warrant on the treasury, payable in gold or silver coin to them, for the payment of their proportionate share of that fund, or show cause why he does not do so.

The further prayer is, if no good cause be shown for failing so to do, then that a peremptory mandamus issue, commanding him to apportion the proceeds of the two mill tax, and issue his warrant, etc.

The auditor, by way of return to the alternative writ, admits all the allegations in the petition, and says, he refused to receive the bonds, and to draw his warrant on the treasury for this amount, or for any apportionment on them, for the reason there was no money in the treasury to the credit of the fund for such payment or apportionment, nor any prospect of there being any there, to the credit of that fund ; and as a reason why a peremptory writ should not issue, he says,

that in pursuance of article fifteen, and the twenty-first section of an act, entitled "An Act to amend the act concerning the public revenue," approved February 8, 1849, a tax of two mills on each dollar's worth of taxable property, was for a long time collected from the tax-payers of the State, for the purpose of paying the principal of the State indebtedness mentioned in that article and section; that the fund was paid out on such indebtedness, so long as it remained depreciated; that on the first day of January, 1859, there were funds in the treasury, levied under this article and section, ready to be apportioned and paid on the State indebtedness, amounting to seven hundred and seventy-one thousand five hundred and twenty-seven dollars and seventy-four cents, and on that day, no more than thirty-one thousand five hundred and fifty-one dollars of State indebtedness were presented for apportionment, all which was paid in full, leaving of said fund, more than seven hundred thousand dollars which could not be applied according to the provisions of that article and section, for the reason, the holders of such indebtedness would not apply for it, and receive it; that on the first day of January, 1860, there were in the treasury, to the credit of this fund, seven hundred and five thousand eight hundred and sixty-six dollars and twenty cents, not one dollar of which was applied for on such indebtedness; that on the first day of January, 1861, there were in the treasury, to the credit of this fund, five hundred and ninety-six thousand seven hundred and nine dollars and ninety-eight cents, and no more than sixteen thousand six hundred and fourteen dollars and sixty-eight cents of such indebtedness was presented for payment or apportionment, all which was fully paid; that no indebtedness was presented on the first day of January, 1862.

He further returns, that at each and all the times mentioned, the State indebtedness now presented by the relators, was in existence, either in the shape it now bears, or in the evidences of indebtedness, for which their refunded bonds were issued.

And for a further return, the auditor states, that in pursuance of an act of the General Assembly, entitled "An act to

relieve the people of this State from the payment of exorbitant and unnecessary taxes," approved February 8, 1861, he transferred, on the 15th day of February, 1861, to the revenue fund, all the remainder of the two mill tax fund then on hand, and it has been fully paid out to meet appropriations made by law ; that in pursuance of this act, all the funds paid into the treasury since that time, except the interest fund, the school fund, and the Central Railroad fund, have been paid into the revenue fund subject to the usual appropriations made by law. He further states, in pursuance of the laws of this State, a tax of three and one-fifth mills on the dollar, for a revenue fund, was levied in the year 1860, and collected in the year 1861, and that there is now in the treasury, of the proceeds of this tax, sufficient to pay in full the bonds held by relators, but he says, if these bonds are ordered to be paid out of this revenue fund, there will be no adequate provision for the ordinary expenses of the State, and the treasury will be bankrupt and wholly unable to pay the usual appropriations ; by reason of all which facts, the auditor insists that the relators have waived their right under the fifteenth article of the constitution. To the return of the auditor is appended a statement of the condition of this fund, verifying the return.

The truth of this return is not disputed, and the only question, is as to the validity of the act of February 8, 1861, considered in the light of the fifteenth article of the constitution of the State. That article is as follows : " There shall be annually assessed and collected, in the same manner as other State revenue may be assessed and collected, a tax of two mills upon each dollar's worth of taxable property in addition to all other taxes, to be applied as follows, to wit: the fund so created shall be kept separate, and shall, annually, on the first day of January, be apportioned and paid over *pro rata,* upon all such State indebtedness, other than the canal and school indebtedness, as may for that purpose be presented by the holders of the same, to be entered as credits upon, and to that intent, in extinguishment of the principal of said indebtedness." (Scates' Comp. 75.)

What are the provisions of this act, and has it placed this

fund beyond the reach of the holders of such State indebtedness ?

The act is accompanied by a preamble, reciting, substantially, the facts set forth in the auditor's return ; and further recites, that the convention that framed the constitution, declared that the fifteenth article contemplates a consent on the part of the bondholders to receive the funds when collected, as indispensable to its assessment and collection. The first section provides for the assessment and collection of a tax of one-half of one mill upon each dollar's worth of taxable property for the year 1861, and also for the year 1862 ; and the assessment and collection of all other State taxes, except the school tax, for those years is suspended.

The second section provides that all funds now in the State treasury, belonging to the State, except the interest fund and the school fund, and the Central Railroad fund, shall be loaned and transferred by the State treasurer upon the auditor's warrant, to be drawn for that purpose, to the revenue fund ; and all funds hereafter received into the State treasury and belonging to the State, except the said interest fund, and the said school fund, and said Central Railroad fund, shall be paid into said revenue fund ; and said funds shall be subject to be drawn therefrom upon auditor's warrants, issued for the payment of appropriations made by law. (Session Laws, 208.)

This is the section of the act which the relators insist is in contravention of the fifteenth article of the constitution. .

We always approach questions of this nature with reluctance, and with great diffidence, for the legislature is a co-ordinate department of the government, whose exclusive province it is to make laws. But the constitution is supreme over all the departments of the government, and it is for the judiciary so to declare, and to bring all enactments of the legislature to that standard—to test them by its provisions, when a question is made touching their validity, always remembering, that only in a clear and palpable case, will the court pronounce against the validity of an enactment. If it

be doubtful, the doubt is usually solved, and should be, in favor of the legislative power.

This seems to be a palpable case. The fifteenth article of the constitution is plain and explicit, not a doubtful or ambiguous expression in it, and it is peremptory to the legislature. It contains, in no part of it, nor by reference to any other article or clause of the constitution, the slightest suggestion or intimation that the consent of the holders of State indebtedness, to call for and receive the funds when collected, was an indispensable, or any other condition, to the assessment and collection of this tax, and to the creation of this fund. This just provision had its origin in no such suggestion. It was the promptings of a people awake to the honor of their State, to preserve that honor unsullied, by yielding up, as a voluntary offering, a portion of their hard-earned means. To save the credit of the State, to escape the gulf of repudiation, was the dominant consideration. Never, perhaps, in the history of any State, has a grander spectacle been presented, than the action of our people, when in the darkest period of our infant history, public and private embarrassment being almost universal, in their voluntary uprising to subject themselves to a heavy tax, and shackle themselves for an indefinite period. And for what? Not for a consideration thereafter to be received by them and their children, nor for future benefits in the shape of splendid and useful public works, from which they might derive a pecuniary advantage, but solely to establish the credit and honor of the State, to preserve its good name throughout all future time. This, and this only, we conceive, was the incentive to this provision in the organic law, and an incentive more noble could not actuate a people. By force of this popular action, State credit awoke from its death-like torpor, and a new life was infused, as by magic, into all the veins and arteries of the body politic. In all the money markets of the world our evidences of debt were eagerly sought by capital, and were universally regarded as one of the most secure and valuable investments. So greatly did our credit appreciate, by this act of justice exhibited by the people in voting this article, that the holders of our bonds

had no motive to present them for apportioned payments on them. They were content with this solemn public pledge ingrafted upon the organic law, thus placing their rights, as they supposed, beyond the reach of temporary excitement and popular clamor. All apprehensions vanished, and the wonted timidity of capital at once gave place to deep-seated confidence. This solemn guarantee, was all they could demand, or had a right to expect, and the people gave it cheerfully.

What then must have been the sentiment, on the enactment of the law of February 8, 1861 ? For what does it provide ? For nothing less than the utter perversion of this fund, to purposes never contemplated by the people who established it, in disregard of their wishes, and in violation of the rights of its beneficiaries.

However honest may have been the motives of the legislature—and we do not question them—however praiseworthy may be the desire to relieve the people from a heavy, and, apparently, an unnecessary tax, and however obligatory it may be so to legislate, the injunction of the constitution should be a consideration above them all. No protests, whatever, can be an apology for unconstitutional enactments, and they seldom find favor even with those they were designed to conciliate. Private distress, great financial embarrassments, even a public calamity, are held, by a just people, as airy nothings, when weighed against the high behests of the constitution.

When the act of 1861 became a law, a cloud came over the fair fame of our State, sullying its former brightness, and exciting fearful apprehensions. The argument to justify it was not then deemed sound, and to the most moderate capacities, a departure from the constitution was more than intimated. The same argument is pressed now, with all the earnestness and skill of distinguished counsel.

And what is the argument ? That the State was under no obligations to her creditors to provide this guarantee—that it was inserted in the constitution for the benefit of the people, and their benefit alone should be regarded when it is sought to be enforced. It is urged, instead of benefiting the people, it is

oppressive upon them, by compelling them to pay annually, in gold or silver, many hundred thousand dollars, to remain idle, and unproductive in the treasury, those for whose use it was collected not wishing to receive it—that the true meaning of the article is, that this fund shall be kept separate, until the first day of January of each year, and if not then called for, it should be deemed surplus, and pass into the general fund, from and after that day.

We cannot perceive in the article itself, one word or phrase encouraging this view, nor is there any fact, in the history of its adoption, that can be appealed to in its support. The credit of the State, at the time this article was incorporated into the constitution, was at the lowest ebb, and a gigantic debt filled its people with dismay. Their instinctive sense of justice warned them that the debt must be paid, and our drooping credit resuscitated, and their good sense informed them that the only mode by which these could be successfully accomplished, was by the contribution of a portion of the earnings of their labor. They felt they were under honorary obligations, which, with a high-minded and just people, are more imperious than those merely legal, to provide in the most ample manner, for its eventual payment. The debt was evidenced by writings bearing the impress of the great seal of State, the token alike of our right to create the debt, and of an ability to exercise the taxing power to raise means to pay it, both attributes of a sovereign State, and both by the great seal proclaimed. To tax themselves, or seek dishonorable shelter in repudiation, was the proposition, and though demagogues advised the latter, a proud people cheerfully adopted the former. They pledged their faith and honor, " come what may," a fund should be raised from their labor, and set apart, and consecrated to this just purpose, to remain inviolate, until not a vestige of the debt remained. They knew and felt the credit of the State was in their keeping, and the path of duty too plain to be mistaken. They knew, too, that its preservation would be to them, individually, of more substantial and enduring benefit than untold millions in coined gold, for public

dishonor does not fail to leave a stain upon the individual citizen.

The people had a double object in this article : to provide certain means to pay an honest debt, and thus benefit the holders of our indebtedness, and to exalt the character of the State, and thus benefit themselves who are its component parts. Their collected will is embodied in this article, and they are here, now, complaining of this act of 1861, as violative of that will. They are, in form and substance, the party plaintiff in this action, and they invoke us to preserve, unsullied, their plighted faith, and to carry out, in their true spirit, their stern commands.

It is in vain to urge, in support of the views of the counsel for the auditor, that the legislature had, theretofore, as early as 1857, treated this fund, remaining uncalled for, as a surplus. The act of Feb. 19, 1857, directed the uncalled-for portion of this fund to be invested in the purchase of State indebtedness. This was applying the fund to a purpose, germane to the object of the article in question, and though not in the mode prescribed by it, may relieve this act from the charge of unconstitutionality, yet none will deny it is not in strict conformity with the requirements of the constitution. But we are not called upon to pronounce upon that act, or upon others of a kindred character. This act of 1861 bears upon its face its illegal purpose. It stands isolated, and, in our judgment, self-condemned.

What, then, was the duty of the auditor under article fifteen of the constitution ? He is a member of the executive department of the government, and alike controlled by the constitution. It is to him, as to all of us, the supreme law — there is none higher or paramount to it, and he must, as others, in all cases, govern his action by it, having taken an oath so to do. The case of *The People* v. *The Auditor*, 12 Ill. 307, defines his duties in such a case as this. The court there say, they are plain and manifest. The fifteenth article is plain and explicit in its terms. It is capable of but one construction—it is complete in itself, and can be executed without the aid of legislation. And the court further say,

that the act of February 12, 1849, which directed that a portion of this fund should be paid to the governor of the State, as the holder of the surplus revenue deposited with the State by act of Congress, that so much of the act as made this disposition of it, was a clear and palpable violation of the constitution; and they further say, the legislature might, with equal propriety, direct the whole of this tax to be annually added to the school fund, or distributed among the several counties in the State.    Id. 316.

But it is urged by the counsel for the defense, since the fund no longer exists, a mandamus will be ineffectual; that the return of the auditor shows there is no existing fund which can be reached by this process; that when the desired end cannot be accomplished, none of the machinery should be set in motion.

The case of *Pike County* v. *The People*, etc., 11 Ill. 202, settles this point.   There a specific sum had been granted by the legislature, to Pike county, to be held in trust for certain purposes.   The county diverted this fund from the purpose, and mixed it with the general funds of the county.   A peremptory mandamus was awarded to compel such fund to be paid over to the beneficiary, and directed an order should be drawn upon the general funds of the county then in the treasury.   We can perceive no difference, in principle, between that case and this.   The power of the court to award the writ, was fully sustained by the able arguments of the relator's counsel in that case, who is one of the counsel for defendant in this case, and makes this point.   He there contended for the writ, and asserted, that mandamus was the only remedy.

But it is further asked by the counsel for the defendant, must the State, year after year, assess and collect this tax, from which nothing is withdrawn, and a large mass of unavailable means be accumulated in the treasury?

We answer, most emphatically, such is the bounden duty of the State authorities—a high constitutional obligation is imposed for such purpose, from which there is no other

exemption, than a repeal of the article itself, by the same power that inserted it in the constitution.

That article is the foundation stone of the State credit. It is on that rock, it has been built up to such magnificent dimensions, and if removed, it must totter to its fall, and be, once more, a ruin. When any authority attempts to suspend any portion of the organic law, without a provision for such purpose, in the law itself, that moment a blow is struck at the very being of the government, and its existence seriously endangered. Whatever else we may do, let it not be said, of the authorities of this State, that they spurn constitutional obligations, or, for any purpose, attempt to suspend the free, uncontrolled and unabridged action of that sacred instrument. Let it not be said, however great disasters may befal us, however much we may be impoverished, how heavy the burden imposed upon us may be, we will, for relief, destroy the constitution, or disregard its requirements. Our safety, in the midst of perils, is in a strict observance of the constitution — this is the bulwark to shield us from aggressions. Trifling with it, treating it lightly, dispensing with this or that provision of it, is the sure precursor of the direst calamity which can befal the people, the end of which cannot fail to be, anarchy and ruin.

But, it is argued by the counsel for the auditor, that inasmuch as the relators failed to present these bonds when the fund was in the treasury, they have, virtually, waived all their rights under the fifteenth article, and so the auditor insists in his return.

The answers to this are obvious. It does not appear in any part of the proceedings, that the relators held these bonds on the first day of January, 1862, or in any prior year. The provisions of this article and its benefits were designed to include all holders, no matter at what time they may have become such, and they have an undoubted right to insist upon the fulfillment of all the pledges contained in the article, on the faith of which they might have become such holders; this pledge might have been the inducement to their purchase. Because the bonds were not presented before the first day of

January, 1863, can it be said, or inferred, they never would be presented ? With equal justice might it be claimed, the non-presentation worked their extinguishment. The argument assumes that the holders of bonds should present them on every "New Year's day." This view would require the presentation of all the outstanding bonds, when the article provides a *pro rata* apportionment and distribution of the fund, only on such bonds as may be presented.

It would not be wise to say, that a bank of issue should not have money on hand with which to redeem its circulation, because the confidence of community in its notes was so great as to cause no demand upon it for coin.

The auditor has returned, there is a sufficient amount of money in the treasury to pay these bonds, but if they are ordered to be paid, there will be no adequate provision remaining to meet the ordinary expenses of the State government.

This return was made whilst the General Assembly was in session, composed of high minded, and patriotic, and just men, clothed with ample powers to provide for all financial difficulties. We have no doubt, had they been advised of this demand, they would have come up promptly to the rescue of the State credit, and as eagerly, and with the same motives, as did the delegates of the people, in the constitutional convention, by whom this article was inserted in the constitution.

This special fund is, in contemplation of law, still in existence, and if the officers of the State, whose duty it was to have assessed and collected the annual tax to sustain it, have not so done, we may not be able to relieve the relators, by taking the amount which should have been annually collected, out of the general fund. But, as it is shown by the return of the auditor, there is money in the treasury, collected for this fund, prior to 1861, we can compel its application and distribution to the relators, but the mode by which this is to be done, must be by the usual mode of a warrant on the treasury.

A peremptory mandamus must be awarded against the auditor, requiring him to issue a warrant on the treasury, in

payment of such of the bonds described in the petition, as may be presented to him by the relators, for such purpose.

This petition, stripped of its verbiage, is but an application for an order, to compel the auditor to issue such warrant, which he has refused to the relators on their application. In what description of money the warrant shall be paid, when presented at the treasury, is not for this court now to determine; we can only compel the auditor to issue a warrant, as in other cases.

With the most anxious desire to sustain a co-ordinate department of the government, in the exercise of its legitimate powers, we are constrained to say, that the act of February 8, 1861, so far as it transfers this special fund, created by article fifteen of the constitution of the State, to the revenue fund, is contrary to the true intent, spirit and meaning of that article, and is therefore, to that extent, void.

*Mandamus awarded.*