[No. 21057. Department Two. January 31, 1928.]

THE STATE OF WASHINGTON, *on the Relation of* JOHN C. MASON, *Respondent,* v. BOARD OF COUNTY COM-
MISSIONERS OF KING COUNTY *et al., Appel-
lants,* PORT OF SEATTLE, *Intervener
and Respondent.*[1]

[1] PARTIES (5)—ONE SUING ON BEHALF OF ALL—EFFECT OF INTER-
VENTION. Objection to the capacity of a citizen and tax payer to maintain an action to rescind an arbitrary and capricious redistricting of county commissioner districts is unavailing, where a port district having a direct interest therein intervened as a party plaintiff.

[2] MANDAMUS (73)—PARTIES PLAINTIFF—PORT DISTRICT. A port district, co-extensive with the county, has a direct interest in, and may maintain action to rescind an arbitrary and capricious redistricting of the county commissioner districts, in view of Rem. Comp. Stat., § 9690, providing that the port district powers shall be exercised by three commissioners, one from each of the three county commissioner districts of the county, and that no person is eligible unless a resident of the district from which he is elected.

[3] SAME (5)—GROUNDS—REMEDY BY APPEAL—ACTS OF PUBLIC
BOARDS. Rem. Comp. Stat., § 4076, providing that any person may appeal from any decision of the board of county commis-
sioners within twenty days, does not give any adequate remedy to one not a party to the proceeding before the board; hence mandamus lies to rescind an arbitrary and capricious redistrict-

[1]Reported in 263 Pac. 735.

15—146 WASH.

ing of the commissioner districts made without notice, and the time for the commencement thereof is not limited to twenty days.

[4] SAME (71) — JURISDICTION — LACHES. An application for mandamus to rescind an arbitrary and capricious redistricting of the county commissioner districts being one of public concern and public right, is not affected by the laches or acquiescence of individuals.

[5] SAME (2)—ADEQUACY OF OTHER REMEDY. There being no appeal, and no right to a trial *de novo* on writ of certiorari, and mandamus in this state being but a civil proceeding for the redress of wrongs, the latter is the proper remedy to rescind an arbitrary and capricious redistricting of the county commissioner districts.

[6] EVIDENCE (4-3) — JUDICIAL NOTICE — STATISTICAL FACTS. The courts will not take judicial notice of the population of county commissioner districts.

[7] COUNTIES (15) — COUNTY BOARD — COMMISSIONER DISTRICTS — POWER TO CHANGE. Rem. Comp. Stat., § 4037, requiring the county commissioners in districts "heretofore divided" in such manner as to leave fractional voting precincts, to redistrict all such districts, the clause that such districts shall as nearly as possible contain one-third of the population in each district applies also to districts thereafter to be changed, in view of the clause that the "districts provided for" shall not be changed oftener than once in four years.

[8] SAME (15)—COUNTY BOARD—POWERS—DIVISION OF COUNTY—ARBITRARY ACTION. Under Rem. Comp. Stat., § 4037, requiring county commissioner districts to comprise as nearly as possible one-third of the population of the county, the action of the board in redistricting a county into three districts one of which has a population of 116,778 registered voters, and the others 15,497 and 15,745, respectively, is arbitrary and capricious.

[9] MANDAMUS (35)—SUBJECTS OF RELIEF—MATTERS OF DISCRETION— ACTION OF COUNTY BOARD. Mandamus lies to compel the county commissioners to rescind an order redistricting the county commissioner districts which is so arbitrary and capricious as to show not only an abuse of discretion but a substitution of arbitrary action for, and a refusal to exercise, an honest discretion.

[10] SAME (35). In such a case, the motive of the commissioners is not a material subject for inquiry.

[11] SAME (35). It is no defense to an arbitrary and capricious redistricting of the county commissioner districts that commis-

sioners nominated in the respective districts are elected by the vote of the county at large.

HOLCOMB, J., dissents.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered January 3, 1928, in mandamus proceedings to compel the county board to rescind its action in redistricting the commissioner's districts of King county. Affirmed.

*Hartman & Hartman* and *Shorett, McLaren & Shorett,* for appellants.

*John S. Robinson, Preston, Thorgrimson & Turner,* and *Bradford & Snyder,* for respondents.

MAIN, J.—This is an action in mandamus. The plaintiff brings the action as a citizen, taxpayer and elector. The defendants are the members of the board of county commissioners of King county. The purpose of the action was to require the defendants to rescind an order which they had made redistricting the county as to the commissioner districts. After the action was begun, the port district, a public corporation, the boundaries of which coincide with the boundaries of King county, intervened. The trial resulted in an order directing the defendants to rescind the order complained of, from which they appeal.

On July 25, 1927, the board of county commissioners of King county passed a resolution, by which the boundaries of the commissioner districts of that county were changed. This resolution was supported by two of the commissioners and resisted by the third. The present action to require it to be rescinded was instituted November 21, 1927. The resolution, by its terms, was not to go into effect until January 1, 1928.

When the resolution complained of was passed, and for some years prior thereto, district number 1 of King

county consisted of the central portion of the city of Seattle, and at the time the resolution was passed, had 53,939 registered voters. District number 2 consisted of the southerly portion of the city and the country precincts to the south and southeast, and had 35,270 registered voters. District number 3 consisted of the northerly portion of the city and the country precincts to the north and east and had 58,811 registered voters. The population of the respective districts was in like proportion to the registered voters.

District number 1, as provided for in the resolution complained of, comprised all that portion of King county lying within the limits of the city and would have 116,778 registered voters. District number 2 would contain the precincts to the south and southeast of the city and would have 15,497 registered voters. District number 3 would contain the precincts to the north and east and would have 15,745 registered voters. It thus appears that, under the resolution, district number 1 would have almost eight times as many registered voters as either one of the other districts and almost four times the number of both of the other two combined. To state it otherwise, district number 1, with 116,778 registered voters, would have one commissioner; district number 2, with 15,497 registered voters, would have one commissioner; and district number 3, with 15,745 registered voters, would have one commissioner. The trial court held that the resolution redistricting the county was arbitrary and capricious, because of the inequality in the number of registered voters and the population of district number 1 as compared to the other two.

[1, 2] Before reaching a discussion of the merits, it will be necessary to pass upon certain preliminary questions. Upon this phase of the case it is first argued that the respondent, as a citizen, taxpayer and elector, had

no capacity to maintain the action.. There is an abundance of authority to the effect that, when the question is one of public right, as here, and the object of mandamus is to procure the enforcement of a public duty, the one bringing the action is not required to show that he has any legal or special interest in the result, but it is sufficient if he shows that he is interested as a citizen in having the laws executed and rightly enforced.

It is not necessary, however, for us here to determine that question because, after the action was instituted, the port district intervened and there can be no question but what that district has a special interest. Section 9690, Rem. Comp. Stat. [P. C. § 4473], which is one of the sections of the port district act, in part provides that:

"The powers of the port district shall be exercised through a port commission consisting of three members, one from each of the three county commissioner districts of the county in which the port district is located, when the port district is coextensive with the limits of such county."

And further, that:

"No person shall be eligible to hold the office of port commissioner unless he is a qualified voter, and freeholder within such port district, and is and has been a resident for a period of three (3) years, except as hereinafter provided, of the commissioner district from which he is elected."

The appellants argue that the port district is not interested because they say that it was the intention of the legislature to fix permanently for the port commissioners the county commissioner districts as they existed at the time the port district act was passed. With this contention we cannot agree. There is nothing in the port district act which indicates that the districts there provided for should be other than the dis-

tricts of the county commissioners as they should be changed from time to time. It is said, however, that if this construction be given to the port district act, then that act is unconstitutional. In support of this, cases are cited which hold that, when the legislature provides for a standard form of insurance policy and leaves the matter of the terms of the policy to the insurance commissioner, this is an unlawful delegation of legislative power. The rule of those cases has no application here. The county is one of the subordinate divisions of the state, and if the legislature has the power to delegate to the county commissioners the right to fix in the first instance and change the boundary lines of the commissioner districts, it would seem to follow necessarily that, when the port district, a public corporation, was created, the legislature had the power to determine in what manner the commissioner districts therein should be provided for. The objection urged against the right to maintain the action is not well founded.

[3] It is next contended that the action was not begun in time. From the facts above stated, it appears that the resolution was passed on July 25, 1927, and the action was instituted on November 21, 1927. Section 4076, Rem. Comp. Stat. [P. C. § 1679], in part provides:

"Any person may appeal from any decision or order of the board of county commissioners to the superior court of the proper county. Such appeal shall be taken within twenty days after such decision or order. . . ."

In *Morath v. Gorham*, 11 Wash. 577, 40 Pac. 129, it was held that an appeal from the order of the board of county commissioners can be prosecuted only by one who was a party to the proceedings before the board.

In the present case, the respondent was not a party to the proceeding. In fact, the board simply met and passed the resolution. No 'right of appeal existed, because the respondent was not a party to the proceeding. Where the right of appeal exists but is an inadequate remedy, it has been held that applications for writs of mandamus should be made within the time fixed for the taking of appeal. In *State ex rel. Hawksworth v. Clifford,* 130 Wash. 103, 226 Pac. 272, it was said:

"We have time and again held that where there is a statutory right of appeal but it is an inadequate remedy, applications for writs. of mandamus should be made within the time fixed for the taking of appeals, and when not so made will be denied."

There being no remedy by appeal, the respondent was not required to bring mandamus within twenty days after the resolution was passed.

[4] In addition to this, the matter is one of public concern and public right and the right to maintain the action was not barred by laches or acquiescence. In *People ex rel. Hull v. Taylor,* 257 Ill. 192, 100 N. E. 534, it was said:

"It is insisted that the relators have been guilty of laches, and that with knowledge of the making of the contract for the purchase of the machines at great expense, and of the intention to install them, they took no action for several months, but waited until a few days before the election to begin their action. Laches or estoppel on the part of the relators, however, has nothing to do with this proceeding. Though the relators have a special interest, the object of the suit is not a matter of individual interest but of public concern, and any citizen might have become the relator in a suit to enforce the public right. *County of Pike v. People,* 11 Ill. 202; *People v. Board of Education,* 127 Ill. 613, 21 N. E. 187. Such a suit involving the public

interest is not barred by the laches or acquiescence of individuals or the conduct of a relator.''

The action was brought in time.

[5] The third of the preliminary questions is whether mandamus was the proper remedy. As a preface to the consideration of this question it is well to get a correct view as to what a mandamus proceeding is in this state. In *State ex rel. Taro v. Everett,* 101 Wash. 561, 172 Pac. 752, L. R. A. 1918E 411, it was said:

"But however forceful this objection might be as applied to proceedings under the writ as anciently administered, this court has held that it is without application to the statutory writ of mandamus; that the writ of mandamus under the code is not a prerogative writ issuable at the pleasure of the state in aid of a private individual, but a civil procedure under the code, and that any person who has a cause for its invocation has the same right to sue out the writ as he has to commence a civil action to redress a private wrong.''

As already pointed out, there was no appeal from the action of the board of county commissioners. A writ of certiorari, or review as it is called under the statute, would not have been an adequate remedy, because in that proceeding there could have been no trial *de novo* in the superior court and the hearing would have been limited to the record made by the board of county commissioners. In *State ex rel. Yeargin v. Maschke,* 90 Wash. 249, 155 Pac. 1064, it was said:

"Had, then, the relator a remedy by certiorari? In that proceeding there can be no trial *de novo* in the reviewing court unless such a trial is authorized by statute. 6 Cyc. 833; Bailey, Habeas Corpus, p. 737; Harris, Certiorari, p. 65; *Los Angeles v. Young,* 118 Cal. 295, 50 Pac. 534, 62 Am. St. 234; *Commissioners*

of *Mason & Tazewell Special Drainage Dist. v. Griffin,* 134 Ill. 330, 25 N. E. 995; *State ex rel. Spokane & Inland Empire R. Co. v. State Board of Equalization,* 75 Wash. 90, 134 Pac. 695.

"No statute in this state has been called to our attention which gives the right to a trial *de novo* when there is a review by certiorari.  As already stated, anything short of a trial *de novo* in the superior court would be unavailing to the relator, because he could not otherwise show that the action of the county commissioners was arbitrary or capricious.  The writ of certiorari, if issued, would bring before the superior court for review simply the record made by the county commissioners, and the facts or motives which actuated the commissioners would not be shown by the record, and could not be shown in the superior court without a trial *de novo*.  Certiorari would not be an adequate remedy."

[6]  It is said, however, that no trial *de novo* was necessary because the court would take judicial notice of the population of the various commissioner districts proposed by the resolution.  It is true that courts will take judicial notice of the population of the counties, cities and towns and of the approximate rate at which the population thereof increases.  But it has been held that courts will not take judicial notice of the population of a school district.  23 C. J. 162; *People ex rel. Dixon v. Board of Education,* 265 Ill. 618.  If courts will not take judicial notice of the population of a school district, it would seem but reasonable to hold that they would not take judicial notice of the population of county commissioner districts.  In order to show that the action of the board, in passing the resolution, was arbitrary and capricious, it was necessary to establish the population of each of the proposed districts, and this could be done only upon a trial *de novo* in the superior court.  In addition to this, if the motive which prompted the resolution were material,

that could only be shown by evidence. Certiorari would not have been an adequate remedy, and the action in mandamus was the proper proceeding.

[7] Having disposed of all of the preliminary questions we will now take up a consideration of the merits. The controlling question, on this phase of the case, is whether the majority of the board, in passing the resolution complained of, acted arbitrarily and capriciously.

Article 11, § 4, of the constitution of this state provides that:

"The legislature shall establish a system of county government, which shall be uniform throughout the state . . ."

Section 5 of the same article provides that:

"The legislature, by general and uniform laws, shall provide for the election in the several counties of boards of county commissioners . . ."

At the first session of the legislature after statehood, an act was passed with the view to carry out these constitutional requirements. Laws of 1890, p. 317; Hill's Code, § 266. That act provided for the division of counties into three districts and for the redistricting thereof, but provided that the lines of the districts should not be changed oftener than once in four years. In 1893 the legislature amended the previous law, which amendment is Rem. Comp. Stat., § 4037 [P. C. § 1686], and reads as follows:

"The board of county commissioners of each county in this state, heretofore divided and numbered as provided by law into three districts in such manner so as to leave one or more fractional voting precincts in any of said districts, shall, at their first session after this act goes into effect, or within three months thereafter, redistrict all of such commissioners districts in the manner provided herein. Such districts shall comprise as nearly as possible one-third of the population

of the county: *Provided, however,* That the territory comprised in any voting precincts of such districts shall remain compact, and shall not be divided by the lines of said districts. The lines of the districts provided for by this section shall not be changed oftener than once in four years and only when a full board of commissioners is present. Counties hereafter organized shall be divided into districts in the manner provided herein, and shall be designated and known as districts numbered 1, 2 and 3."

The purpose of the amendment, apparently, was to insert a provision, which did not exist in the prior law, to the effect that the territory comprising any voting precinct should remain compact and should not be divided by the lines of the districts. The first sentence of the section relates to fractional precincts. The last sentence relates to counties to be thereafter organized. If any power exists to redistrict other than in those two sentences, it must be by reason of the second sentence, which is

"Such districts shall comprise as nearly as possible one-third of the population of the county."

To give this sentence a strict and literal construction, it would refer to only counties in which there were fractional precincts and counties to be thereafter organized. We cannot believe that this was the intention of the legislature. It seems that it must have been intended by that sentence to refer also to districts the boundary lines of which were to be thereafter changed, because it is provided in the third sentence that the lines of the districts shall not be changed oftener than once in four years. If the statute was given the limited construction mentioned, then there would exist no right in the present case for the commissioners to redistrict King county, even if proper consideration was given to the population of each district. It is not, however, seriously contended that such would be the correct

construction. We think the right to change the boundaries of the commissioner district not oftener than once in four years applies to the redistricting of a county as well as to cases where there are fractional voting precincts and to subsequent organized counties.

[8] This brings us to the immediate consideration of whether the action of the majority of the board of county commissioners, in passing the resolution complained of, acted arbitrarily and capriciously. The statute requires, as already pointed out, that the districts shall comprise, "as nearly as possible one-third of the population of the county." From the facts above stated, it appears that the population of district number 1, under the resolution as passed, would be approximately seven and one-half times that of either of the other districts and almost four times as great as the population of the other two combined. In the cases of *Harnett v. Sacramento County*, 195 Cal. 676, 235 Pac. 445, and *State ex rel. Fall v. Kelso*, 46 Nev. 128, 208 Pac. 424, where the disparity in population of the proposed districts was much less than it is here, the courts held that the proposed districts did not meet the requirement of the law which required each of the districts to contain "as near as may be" one-third of the voting population of the county. In the *Kelso* case it was said:

"The Legislature had good reasons for requiring that the districts should each have, as near as may be, one-third of the population. By the words 'as near as may be,' the Legislature sought to give the commissioners some latitude; but it was not contemplated that the true spirit of the act, which was to require such a districting of the county as would give to each district substantially one-third of the population of the county, should be violated.

"If the board can so ignore the clear spirit of the

statute as to so district the county that one of the districts shall have in it more than one-half of the voters of the county, might it not, with equal propriety, so divide it that one district will have two-thirds or three-fourths of such voters? The provision in the statute thus violated is one of substance, and cannot be ignored.''

In the cases of *State ex rel. Ratner v. Jones,* 114 Kan. 726, 220 Pac. 275, and *Codington County v. Board of Commissioners,* 47 S. D. 520, 199 N. W. 594, it was held that, where the lines of the commissioner districts of the counties had not been changed for many years and the population of the respective districts had become greatly unequal, an action would lie to compel the county commissioners to redistrict. In the present case, we do not need to go that far and we express no opinion on whether we would entertain mandamus to compel the commissioners of any county to pass a resolution redistricting the county. The basis of those decisions is that, where it clearly appears that the county commissioners refuse to perform an official duty and that, by such refusal, the purpose of the law will be defeated, mandamus may be resorted to to compel them to act.

The cases of *People ex rel. Baird v. Board of Supervisors,* 33 N. E. (N. Y.) 827, and *Donovan v. Suffolk County Apportionment Commissioners,* 224 Mass. 598, 113 N. E. 740, do not relate to commissioner districts, but the principle is the same and is there supported. In the *Donovan* case it was said:

''Whenever this kind of inequality of apportionment has been before the courts, it has been held to be contrary to the Constitution. It has been said to be 'arbitrary and capricious and against the vital principle of equality'.''

Reason.and authority both support the holding that the action of the board of county commissioners of King county in passing the redistricting resolution with such gross inequalities as to population of district number 1 as compared with the other two was arbitrary and capricious.

[9]   We now come to the question as to whether the court will direct by mandamus the board to rescind the resolution.   The test as to when mandamus will issue to compel official action or to rescind an action already taken will be found discussed in the case of *State ex rel. Reynolds v. Hill,* 135 Wash. 442, 237 Pac. 1004, where it was held that mandamus would issue to compel the city commissioners to remove from the streets and sidewalks gasoline pumps which constituted nuisances. It was there held that the court would not issue a writ of mandamus to supervise a general course of conduct, but would issue it in a proper case to compel official action where the choice of methods need not be specified in the judgment requiring the action.   In *State ex rel. Yeargin v. Maschke,* 90 Wash. 249, 155 Pac. 1064, *supra,* the purpose of the action was to secure a writ of mandamus directed to the board of county commissioners of Ferry county for the purpose of compelling such board to vacate and rescind an order by which it had fixed the salary of the court commissioner of that county at one dollar per month, and it was there held that the writ should issue directing the rescission of the order.   It was there said:

"If the relator had no adequate remedy by appeal, or by a writ of certiorari, the question then arises whether mandamus will lie to compel a rescission of the order of April 12, 1913, if in entering that order the commissioners did not exercise an honest discretion, but acted arbitrarily.   The general rule, of course, is that the discretionary power of the board of

county commissioners is not subject to review by the court. But this is not a universal rule. If the action of the board of county commissioners is arbitrary or capricious, or if its action is prompted by wrong motives, there is not only an abuse of discretion, but, in contemplation of law, there has been no exercise of the discretionary power. If an honest discretion, as demanded by the law, has not been exercised, the result is to substitute arbitrary action for such discretion. If a tribunal such as the board of county commissioners acts arbitrarily, or refuses to exercise its discretion, the law will by mandamus require it to exercise its discretionary power.''

[10] Something has been said in the briefs with reference to the motive which prompted the majority of the commissioners to pass the resolution but this is not a material subject of inquiry in this case. The statute is express and positive, as already pointed out, that the districts shall comprise ''as nearly as possible one-third of the population of the county.'' The motive of the commissioners supporting the resolution, whether good or bad, cannot modify the mandate of the statute.

[11] It is also argued that, since the commissioners when nominated are elected by the electors of the county at large, a discrimination as to the population of the districts is not within the rule of the cases above cited. It is true, under the law the commissioners are nominated by the electors of the respective districts and are voted for by the electors of the counties at large. This can make no difference in the application of the rule, because the statute under which the order was made contains no such qualification. To say that the statute should not apply because the commissioners, after once nominated by their respective districts, were elected by the people of the county at large would be to write a limitation upon the statute which the legislature did not put there.

The case of *Morris v. Favor,* 134 Wash. 75, 234 Pac. 1040, so far as it is not in harmony with what has herein been said, will be considered overruled.

The judgment will be affirmed.

Mackintosh, C. J., Askren, and Fullerton, JJ., concur.

Holcomb, J. (dissenting)—Passing all questions of procedure and the propriety and timeliness of the remedy invoked by respondents, as determined in the majority opinion, I am unable to yield my concurrence in the decision upon the construction of the statute in question.

Nor do I see any controlling effect in the provisions of the constitution that the legislature shall establish a system of county government which shall be uniform throughout the state; and that the legislature, by general and uniform laws, shall provide for the election in the several counties of boards of county commissioners.

The legislature complied with the foregoing provisions of the constitution, established county governments throughout the state, which are uniform in structure and operation, providing for officers of the same kind in each and every county, of the same general qualifications, to take office at the same time, and perform generally the same duties. It also provided for the election in the several counties of boards of county commissioners.

The constitution does not control the establishment of the boards of county commissioners, except that the elections, qualifications, terms of office, etc., shall be uniform throughout the state. In complying with that constitutional provision, the legislature did, in 1890, provide for the division of counties into three districts and for the re-districting thereof, and that the lines of

the districts should not be changed oftener than once in four years. Laws of 1890, p. 317. In 1893, the legislature amended that law, which is now codified in Rem. Comp. Stat., § 4037 [P. C. § 1686], the contents of which are quoted in the majority opinion.

By that amendment, the legislature did no more, and evidently intended no more, than that the board of county commissioners in each county should correct the boundaries of commissioners' districts in such counties, where there had been left one or more fractional voting precincts in any such districts, requiring the board of commissioners to re-district all such commissioners' districts, and in such cases, to re-district them so that each district should comprise, as nearly as possible, one-third of the population of the county and so that the territory comprised in any voting precinct should remain compact and not divided by the lines of such districts. The provision was then continued in effect that the lines of commissioners' districts should not be changed oftener than once in four years, etc.

The law is well settled that mandamus does not lie, except to compel the performance of manifestly plain legal duty. In this case, the motive and good faith of the board of county commissioners is not challenged. The wisdom or unwisdom of the re-districting statute in question is not for the court to determine; neither is the wisdom or unwisdom of the act of the board of county commissioners in dividing King county into commissioners' districts, as it has done, a question for courts. There are many miles of road in the outlying districts subject solely to the control of the board of county commissioners. In the urban portion of the county, the streets and thoroughfares are wholly within the control of city and state officers. The policy of dividing the county into districts is based on the

supposition that members of the board ought to be more familiar with the local needs of their constituents. They ought to be in close touch with those they are likely to serve and whose business they administer.

While the law, as it stands, requires the commissioners to be chosen from districts, they are elected by the entire electorate of the county.

Nor, in my mind, are the cases cited, to sustain the opinion of the majority, authorities upon the question here.

The case of *Harnett v. Sacramento County,* 195 Cal. 676, 235 Pac. 445, involved a statute of California, general and broad in its application, reading:

" 'The board of supervisors may, by a two-thirds vote of the members of said board, change the boundaries of any or all of the supervisor districts of a county. Said districts shall be as nearly equal in population as may be. . . . ' § 4029, Political Code of California."

It will be seen that, whenever a board of supervisors of a county in that state acted at all in re-districting supervisor districts, they were obliged to apportion the population as nearly equal as possible in each district. The law was of general and mandatory effect.

*State ex rel. Fall v. Kelso,* 46 Nev. 128, 208 Pac. 424, involved a statute which provided, in effect, that a certain percentage of qualified voters of any county should have the right to petition the board of county commissioners, on or before the first Monday in July preceding any general election, to divide the county into three districts, to be known as commissioner districts. The statute further provided that the districts should be made to conform to the established boundaries of election precincts or wards, and every election precinct or ward should be wholly within one of the commissioner districts. It was also provided that

each district should embrace, as nearly as possible, one-third of the voting population of the county, to be determined by the vote cast at the last general election, and consist of adjoining precincts. It is obvious that, whenever the action of the board of county commissioners in any county was invoked in the manner provided by the law, if they acted at all, they were mandatorily required to divide the county into districts, each containing as nearly as possible one-third of the voting population of the county. Even the voting population is somewhat different from the total population of a county, for sections of a manufacturing district might contain a great number of transients and non-voters.

*State ex rel. Ratner v. Jones,* 114 Kan. 726, 220 Pac. 275, arose under a statute reading:

" 'The board of county commissioners shall, on the day of the organization of the board or as soon thereafter as may be possible, meet and divide the county into three commissioner districts, as compact and equal in population as possible, and number them respectively 1, 2, and 3, and subject to alteration at least once every three years.' Kansas Gen. Stat. 1915, § 2539."

It is clear that that statute was mandatory in its terms, and presented a manifest duty on the part of boards of county commissioners which could be remedied by mandamus.

*State ex rel. Hopkins v. Tindell,* 112 Kan. 256, 210 Pac. 619, involved the same statute. In that case, among other things, in denying the writ, the supreme court of Kansas said:

"Commissioner districts are created merely to define the territory from which the voters are to select commissioners; they have no functions to perform as governmental agencies. . . .

"A writ of mandamus does not create a duty. It merely enforces one already in existence."

*Codington County v. Board of County Commissioners,* 47 S. D. 520, 199 N. W. 594, was a case where the statute requiring districting in that state was not set out in full, but the court said:

"Upon an examination of section 5864 its chief object seems to be to require that the commissioner districts be compact and regular in form, and should contain about the same number of inhabitants."

From that reference to the statute, it should be assumed that the statute was as broad in scope and mandatory as that quoted from Kansas.

The Massachusetts case of *Donovan v. Suffolk County Apportionment Commissioners,* 224 Mass. 598, 113 N. E. 598, was one involving a report of the commissioners elected under a statute dividing Suffolk county into representative districts and apportioning among them the number of representatives allowed under the statute. The reviewing judge (a single justice of the supreme judicial court of Massachusetts hearing the report of the apportionment commissioners), found such manifest disparities in equality of representation that, of course, he was compelled to set the apportionment aside.

Undoubtedly, the rule in that case would be followed, should this court ever have before it in some way the long disregarded apportionment, provided for under § 3, art. 2, of the constitution, of senators and representatives in the state legislature; should the apportionment be greatly unequal, it would be set aside.

It is clear to my mind that this involves nothing but a question of legislative and political discretion, as was held in *Morris v. Favor,* 134 Wash. 75, 234 Pac. 1040, and that, however imperfectly the legislature may have

legislated, and however imperfectly the board of commissioners may have redistricted, it is no concern of the courts.

I therefore dissent.